WAGNER CHOI & VERBRUGGE

CHUCK C. CHOI
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
cchoi@hibklaw.com
aito@hibklaw.com

Proposed Attorneys for Debtor
And Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>HAWAII NUI BREWING LLC, a Hawaii limited liability company,<br><br>      Debtor and Debtor-in-Possession. | Bk. No. 13-00584<br>(Chapter 11)<br><br><u>Hearing:</u><br>Date:  [to be set]<br>Time:  [to be set]<br>Judge: Hon. Robert J. Faris |

### MOTION FOR ORDER AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING ON A SECURED AND SUPERPRIORITY BASIS; AND (B) USE CASH COLLATERAL; EXHIBITS "A"- "B"

HAWAII NUI BREWING LLC, debtor and debtor-in-possession herein (the

"Debtor"), hereby moves this Court, pursuant to 11 U.S.C. §§ 105, 363,364(c) and

507, and Federal Rule of Bankruptcy Procedure 4001 for an interim and final

order: (i) authorizing the Debtor to incur debtor-in-possession financing ("DIP

Financing") substantially on the terms set forth in the term sheet (the "Term Sheet") attached hereto as Exhibit "A"; [1] and (ii) use cash collateral of its secured creditors pursuant to the two month-budget (the "Budget") attached hereto as Exhibit "B." In support of the motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper before the Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

The Emergency Chapter 11 Filing and Financial Condition

3. On April 9, 2013 (the "Petition Date"), the Debtor filed an emergency petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4. The Debtor filed an emergency petition to stay a trial in an eviction proceeding commenced by Hilo Soda Works, Inc. ("HSW")

---

[1] A form of the Loan and Security Agreement will be submitted prior to the final hearing on the Motion.

entitled *Hilo Soda Works, Inc. vs. Hawaii Nui Brewing LLC*, case no. 3RC
12-1-1274, in the District Court of the Third Circuit, North and South
Hilo Division ("Hilo District Court"), for the alleged non-payment of
approximately $59,000 in back rent due under a Lease dated January 1,
2008 between HSW as landlord and the Debtor as tenant.

5.     The Debtor owns and operates a microbrewery and employs
approximately nine employees.  It was founded in 2007 by two former employees
of Kona Brewing Company and an investor.  The Debtor bottles various brands of
beer under the Mehana and Hawaii Nui labels including "Hapa Brown Ale" and
"Kauai Golden Ale."

6.     On average, the Debtor produces approximately 400 kegs of beer and
approximately 2,500 bottles of beer per month.  Other than retail sales at its
warehouse/facility (which generates about $10,000 a month) and occasional sales
to Japan (totaling approximately $16,000 per annum), all of the Debtor's
production is purchased and distributed by Paradise Beverages, Inc. ("Paradise"),
the largest distributor of alcoholic beverages in the State of Hawaii.

7.     The Debtor's brewery is located at 275 East Kawili Street, Hilo,
Hawaii 96720 (the "Brewery") where the Debtor operates Hawaii's only beer
bottling line.  In addition to the bottling line, the Brewery also serves as a retail and
"tasting center".

8.     The Debtor relocated its brewery operations from Lihue, Kauai to the Hilo Brewery upon a 2009 merger with a Hilo brewery owned by Mehana Brewing Company.  In connection with the merger, an entity called Mehana Tea Company acquired a 50% ownership interest in the Debtor.  In addition, the Debtor entered into a lease of the Warehouse with HSW.

9.     The Debtor has operated at a loss for the past four years.  In 2009, the Debtor's gross revenue was $1,206,902.40 and it operated at a net loss of $268,146.49.  In 2010, the Debtor's gross revenue was $1,409,109.64 and it operated at a net loss of $68,290.28.  In 2011, the Debtor's gross revenues declined to $1,022,981.14 and it operated at a net loss of $340,639.62.  In 2012, the Debtor had gross revenues of $1,064,753.70 but operated at a loss of $644,601.90.

10.     By August, 2012, the Debtor's cash flow had deteriorated to the point that Paradise arranged for shipments of grain and bottles to the Debtor on Paradise's credit on condition that the Debtor repay Paradise within 59 days.  As a consequence, Paradise holds a substantial unsecured claim in this case.

11.     As a consequence, the Debtor has outstanding accounts payable (excluding the secured creditors identified below), totaling approximately $533,487.

Debtor's Secured Creditors and Collateral Base

12.     The Debtor has the following secured creditors:

    a.  First Hawaiian Bank ("FHB"): FHB Holds a senior blanket lien on substantially all of the Debtor's assets pursuant to a UCC Financing Statement filed with the State of Hawaii Bureau of Conveyances ("Bureau") on January 27, 2009, to secure a commercial line of credit with a current outstanding balance of approximately $ 82,842.08 as of March 31, 2013.

    b.  Paradise: Holds a lien on the Debtor's "bottling line" and 247 15.5 gallon steel kegs, 1011 5 gallon kegs pursuant to a UCC Financing Statement filed with the Bureau on April 26, 2011 to secure an obligation with a current outstanding balance of approximately $372,653.36.

    c.  Mehana Investments, Inc.: Holds a disputed subordinated blanket lien[2] on substantially all of the Debtor's assets pursuant to a UCC Financing Statement filed with the Bureau on June 17, 2011 to secure a Secured Subordinated Promissory Note dated June 15, 2011, with a current

---

[2]     The Debtor was insolvent or rendered insolvent as a result of the redemption of membership interests held by Mehana's assignor, Mehana Tea Company, Inc. ("Mehana").

outstanding balance of approximately $340,639.62.

d. Hilo Soda Works, Inc.: Holds a security interest on a 20 foot refrigerated container and related refrigerated system pursuant to UCC Financing Statement filed with the Bureau on March 19, 2012.

e. Lytton I, LLC ("Lytton"): Holds a disputed lien on certain assets of the Debtor pursuant to a UCC Financing Statement filed with the Bureau on April 24, 2012 to secure shareholder loans totaling approximately $320,000 plus interest.[3]

f. Lytton: Holds a junior lien on substantially all of the Debtor's assets pursuant to a UCC Financing Statement filed with the Bureau on April 2, 2013 to secure new shareholder loans totaling approximately $15,000 in addition to the amount identified above.

13.     Of the foregoing creditors, only FHB, Lytton and Mehana (collectively, the "Secured Creditors") hold an interest in the Debtor's cash collateral.

14.     As of the Petition Date, the Debtor had $8,038 in its checking account at FHB.   The Debtor is also holding "inventory" valued

---

[3]     The UCC Financing Statement fails to accurately describe Lytton's collateral.

at approximately $60,000 which can be packaged (in kegs and bottles) for sale. However, the Debtor lacks critical supplies, such as malts and bottles, to continue its production.

## SUMMARY OF DIP FINANCING AND REQUESTED RELIEF

15.    The following is a summary of the proposed DIP Financing:

Lender:  Hawaii Ohana Brewing LLC or assignee ("Lender"). [4]

Amount:  Advances up to $250,000.00 available on entry of Final Order

Interim Amount:  Advances up to $100,000.00 available on entry of Interim Order

Maturity:  May 24, 2013

Use of Funds:  Working capital

Collateral and Priority:

> a.  First lien security interest in any unencumbered assets now owned or hereafter acquired by the Debtor;
>
> b.  Junior security interest in all encumbered personal property assets of the Debtor pursuant to Section 364(c)(2) of the Bankruptcy Code; and
>
> c.  Super-priority over all administrative claims pursuant to Section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out set forth in the Term Sheet.

Interest and Payments      Fixed at eight percent (8%) accrual rate with monthly payment of interest due in arrears on the first business day of

---

[4]      Nina Lytton (a current member and creditor of the Debtor) and Andrew Baker, the Debtor's President, are members of the Lender.

each month.

Borrowing Base:  N/A

Fees:  N/A

Events of Default:

> a. Failure to make any payment of principal of, or interest on, or fees owing when due and payable;
>
> b. Conversion or dismissal of the Debtor's chapter 11 case; or
>
> c. Appointment of a Trustee in the Chapter 11 case.

Carve-Out:  The liens and priority granted to the Lender are subject to a fund a post-petition retainer of $50,000 for Debtor's counsel.

16.     The Debtor requests that the Court approve the DIP Financing on the terms set forth herein and authorize the use of the proceeds for working capital purposes on an emergency interim basis to permit it to continue operations.

17.     The Lender has required, and the Debtor believes it is appropriate, that the DIP Loan be on a secured, super-priority basis in accordance with Section 364(c) of the Bankruptcy Code.

18.     Section 364(c) of the Bankruptcy Code, which governs the ability of a debtor or trustee to obtain secured credit provides as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

> (1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

19.    The Term Sheet provides for all advances to have super-priority in accordance with Section 364(c)(1), and for the advances to be secured by a blanket senior lien on unencumbered property and a junior lien on all other personal property of the Debtor, except for the estate's avoidance claims.

20.    Section 364(e) of the Bankruptcy Code provides that the reversal or modification on appeal of a financing order "does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith . . . ." 11 U.S.C. § 364(e).

21.    The Debtor submits that the Lender is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code.  While the Lender is affiliated with Lytton who is an insider, the Debtor had been negotiating for months with an unaffiliated third party DIP lender who was unable to commit to fund the DIP loan on the eve of the filing.  The proposed DIP Financing is on terms more favorable to the estate than those proposed by this pre-petition DIP lender.  Further, the Lender is extending DIP Financing on commercially reasonable terms.

22.     The Debtor has to date contacted FHB, the lender most familiar with the Debtor's operations but FHB is not willing to extend financing to the Debtor on any terms, let alone on terms more favorable than Lender.  The Debtor has also contacted Paradise, which has extended both secured and unsecured financing to the Debtor and Paradise too is unwilling to extend financing on any terms.

23.     The Debtor submits that the proposed DIP Financing is in the best interests of the estate and its creditors and is critical to preserve the viability of its business.  The Debtor requests, to avoid immediate and irreparable harm to the estate, the Court, at the preliminary hearing, authorize the Debtor to borrow up to $100,000.00 on an interim basis through the date of the final hearing.

## SUMMARY OF CASH COLLATERAL USE AND REQUESTED RELIEF

24.     Attached hereto as Exhibit "B" is a cash flow forecast for the Debtor for the post-petition period through May 31, 2013 (the "Budget"), prepared by the Debtor to project the expected cash flow from the Debtor's operations for the period during which the Debtor requests the use of the Cash Collateral.

25.     The Debtor requests authority to use the Cash Collateral to pay the reasonable and ordinary expenses of operating its business, including, without limitation, payroll and benefit expenses, payroll taxes, federal and state taxes, inventory, supplies and equipment, advertising, utility services, insurance, subcontractors, vendor and supplier services, and other expenditures as are

necessary for operating its business and preserving its going concern value.

26.   The Debtor's authority to use Cash Collateral shall be limited to payment of not more than 110% of the expenses each period (on an aggregate and cumulative basis), as set forth in the Budget unless otherwise agreed by the Secured Creditors; provided, however, that the Debtor is not limited by line item with respect to actual expenses.

27.   With respect to FHB, the Debtor proposes to provide adequate protection for the Debtor's use of Cash Collateral existing as of the Petition Date (the "Pre-Petition Collateral") actually used by the Debtor, by (a) continuing to make monthly payments of $2,035.16 to FHB; and (b) providing FHB with a replacement lien on all post-petition Cash Collateral and all proceeds of said collateral having the same validity, priority and extent as FHB's existing security interest in its Pre-Petition Collateral as of the Petition Date and proceeds thereof, but subject to the same rights and challenges by or on behalf of the Debtor.

28.   With respect to Lytton and Mehana, the Debtor proposes to provide adequate protection for the Debtor's use of Cash Collateral by providing these Secured Creditors with a replacement lien on all post-petition Cash Collateral and all proceeds of said collateral having the same validity, priority and extent as their existing security interest in its Pre-Petition Collateral as of the Petition Date and proceeds thereof, but subject to the same rights and challenges by or on behalf of

the Debtor.

29. "Cash collateral" is defined in Bankruptcy Code Section 363(a) as meaning "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title."

30. Bankruptcy Code Section 363(c)(2) permits a debtor to use cash collateral if either of two alternate circumstances exist:

> (A) each entity that has an interest in such collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Therefore, the Court may authorize use of a creditor's cash collateral in the absence of creditor consent.

31. Authority to use Cash Collateral is consistent with the very purposes for which Chapter 11 exists:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use 'cash

> collateral' in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1019 (11th Cir. 1984).

32.     Courts will allow the use of cash collateral when the use tends to enhance or preserve the debtor's reorganization value. *See, e.g., Stein v. United States Farmers Home Administration (In re Stein)*, 19 B.R. 458, 460 (Bankr. Pa. 1982) (debtor was granted authority to use cash collateral where the secured party was undersecured because the use of cash collateral was necessary to the debtor's continued operations and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]"); *In re Dynaco Corp.*, 162 B.R. 389, 396 (Bankr. D.N.H. 1993) (finding that the alternative to the debtor's use of cash collateral — termination of the debtor's business — would doom the reorganization and any chance to maximize value for all of the creditors).

33.     Pursuant to Section 363(e), "on request of an entity that has an interest in property used, sold or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Thus, the Court may authorize the Debtor to use the Secured Creditors' cash collateral if their interest in such collateral is adequately protected.

34.    Bankruptcy Code Section 361 addresses the issue of adequate

protection, and although adequate protection is not defined therein, several non-

exclusive methods of adequate protection are enumerated:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity
>
> of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

35.    It is only when the value of a secured creditor's interest in collateral

is likely to decline post-petition that added protection is needed:

> The analysis of the Supreme Court in *Timbers* is instructive here. *The phrase 'interest in property' in §*

> 363(e) means the value of the collateral. That is the
> interest that I am required to protect. If that value is
> likely to diminish during the time of the use, adequate
> protection must be provided by the Debtor.

*In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 266 (Bankr.C.D.Cal. 1988)

(emphasis added). *Accord, In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th

Cir.), *cert. denied*, 64 U.S.L.W. 3348 (1995); *In re Westchase I L.P.*, 126 B.R.

692, 694-95 (W.D.N.C. 1991).

36.     Adequate protection is aimed not at protecting precise collateral, but

protecting the value of the secured creditor's interest in collateral. *In re Williams*,

7 B.R. 234, 237 (Bankr. M.D.Ga. 1980). Though a creditor may not be able to

retain his lien upon the specific collateral held at the time of filing, the purpose of

section 361 is to insure that the secured creditor receives the value for which he

bargained.

37.     Courts should take a pragmatic approach when assessing whether a

secured creditor is adequately protected, and that may require consideration of

whatever factors are relevant to a particular debtor. *See, e.g., In re Rogers*, 239

B.R. 883, 887 (Bankr. E.D.Tex. 1999):

38.     The determination of whether a creditor's interest is adequately

protected is not an exact science nor does it involve a precise arithmetic

computation. Rather, it is pragmatic and synthetic, requiring a court to balance all

relevant factors in a particular case, including the value of the collateral, whether

the collateral is likely to depreciate over time, the debtor's prospects for a successful reorganization and the debtor's performance under the plan. *In re Olick*, 221 B.R. 146, 161 (Bankr.E.D.Pa.1998). Other considerations may include the balancing of hardships between the parties and whether the creditor's property interest is being unduly jeopardized. *Id.*

39.     The Bankruptcy Code expressly provides that the granting of additional liens constitutes a means of providing adequate protection. See 11 U.S.C. § 361(2) ("adequate protection may be provided by . . . an additional or replacement lien to the extent that such. . . use . . . results in a decrease in the value of such entity's interest in such property.")

40.     Courts have recognized that the granting of replacement liens, coupled with the continued operations of the debtor, provides adequate protection of a creditor's interest in cash collateral used by the debtor. *See, e.g., Mbank Dallas v. O'Connor* (In re O'Connor) 808 F.2d 1393, 1196-96 (10th Cir. 1987) (debtor authorized to use cash collateral to drill gas wells where creditors offered replacement liens of equal or greater value on well proceeds and other regular income).

41.     The Secured Creditors will be granted a replacement lien on the Debtor's pre-petition assets with a value equal to the amount of the Cash Collateral expended by the Debtor.

42.     Accordingly, where a debtor's use of cash collateral protects its secured creditor from such loss, the secured creditor is adequately protected without any other form of adequate protection. *See, e.g., Orix Credit Alliance, Inc. v. Delta Resources, Inc.*, (In re Delta Resources, Inc.), 54 F.3d 722, 730 (11 Cir. 1995).

43.     In enacting section 363 of the Bankruptcy Code, Congress specifically recognized that it might be necessary to schedule expedited hearings on requests for authorization to use cash collateral because of the business exigencies of individual cases. Section 363(c)(2)(B) authorizes the use, sale, or lease of cash collateral "after notice and a hearing." Section 363( c)(3) provides, in pertinent part:

> Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with the hearing under subsection (e) of this section, but shall be <u>scheduled in accordance with the needs of the debtor</u> . .. <u>The court shall act promptly on any request for authorization under Paragraph (2)(B) of this subsection.</u>

11 U.S.C. § 363(c)(3) (emphasis added).

44.     Similarly, the Ninth Circuit Court of Appeals has recognized that <u>ex parte</u> interim relief may be crucial to the success of a reorganization:

> We realize that 'in certain circumstances the entire reorganization effort may be thwarted if emergency relief is withheld" and that reorganization under the Bankruptcy Code "is a perilous process, seldom more so

than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund essential business operations.' [citation omitted] . . . It is for this very reason that Congress specified that hearings concerning the use of cash collateral 'shall be scheduled in accordance with the needs of the debtor.'

*Owens-Corning Fiberglass Corp. v. Center Wholesale, Inc. (In re Center Wholesale, Inc.,* 759 F.2d 1440, 1449 n. 21 (9th Cir. 1985).

45.     Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedure provides that, at a preliminary hearing, the "court may authorize the use of *only the amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.*" Fed. R. Bankr. Proc. Rule 4001(b)(2) (emphasis added).

46.     The Debtor requests, to avoid immediate and irreparable harm to the estate, the Court, at the preliminary hearing, authorize the Debtor to use the Secured Creditor's Cash Collateral through the date of the final hearing.

47.     The Debtor must have the immediate use of the Cash Collateral to meet payroll, to meet the daily costs and expenses of operating, to promptly pay its vendors, and to acquire goods and services to keep the Debtor operating. Any delay in the Debtor's ability to meet any of these needs could deprive the Debtor of its business and the ability to successfully reorganize its financial affairs, to the prejudice of all creditors and parties in interest.

## CONCLUSION

48. WHEREFORE, the Debtor respectfully requests that the Court grant the Motion: (a) authorizing on an interim basis, the DIP Financing set forth herein; (b) authorizing the use of Cash Collateral on an interim basis; (c) setting a final hearing on the Motion; and (d) granting such other relief as the Court deems fair and just.

DATED: Honolulu, Hawaii, April 11, 2013.

/s/ Chuck C. Choi
CHUCK C. CHOI
Proposed Attorney for
Debtor and Debtor-in-Possession

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

In re:

HAWAII NUI BREWING LLC, a
Hawaii limited liability company,

      Debtor and Debtor-in-
      Possession.

Bk. No. 13-00584
(Chapter 11)

## DECLARATION OF ANDREW K. BAKER

I, ANDREW K. BAKER, hereby declare that, I am over the age of 18 years

old, and I competent to make this declaration and I make this declaration upon my

personal knowledge, except as otherwise stated. If called and sworn as a witness, I

could and would testify competently thereto.

1.     I am one of the founders of Hawaii Nui Brewing LLC (the "Debtor")

and have been employed by the Debtor since 2007 in various capacities, including

Senior Sales Manager and President. I am currently Manager and President of the

Debtor and I am familiar with the Debtor's operations and history.

2.     I have reviewed the MOTION FOR ORDER AUTHORIZING

DEBTOR TO (A) OBTAIN POST-PETITION FINANCING ON A SECURED

AND SUPERPRIORITY BASIS; AND (B) USE CASH COLLATERAL

("Motion"). Terms used herein and not otherwise defined shall have the meanings given them in the Motion.

3.     All of the facts set forth in the Motion are true and correct to the best of my knowledge, information and belief.

4.     Attached hereto as **Exhibit "A"** is a true and correct copy of the proposed Term Sheet between the Debtor and the Lender in substantially final form.

5.     Attached hereto as **Exhibit "B"** is a true and correct copy of the Debtor's Budget in substantially final form.

6.     Based upon the Budget, the Debtor projects that it may needs significant additional working capital, in addition to the available cash on hand, and forecasted cash receipts expected to be generated by the business, to pay its operating expenses, necessary capital expenditures, and professional fees, among other things, through May 31, 2012.

7.     In my opinion, the proposed financing is necessary to preserve the assets of the Debtor's estate and to pay reasonable and necessary professional fees and expenses that the Debtor has already incurred and expects to incur in the future in connection with the negotiation, drafting and confirmation of the Debtor's plan of reorganization.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 6   Filed  04/11/13   Page 21 of 26

8.     I have contacted First Hawaiian Bank and Paradise about extending further financing to the Debtor.  Neither entity is willing to extend financing to the Debtor under any terms.

9.     Based on my experience, and given the Debtor's financial condition, it is my opinion that the Debtor would be unable to obtain alternative financing on terms more favorable than those presented in the Motion.

10.     I believe that the terms of the proposed DIP Financing are reasonable under the circumstances, and that consummation of a loan will be in the best interests of this bankruptcy estate and creditors.

11.     I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Honolulu, Hawaii, April 11, 2013.

ANDREW K. BAKER

3

## LOAN TERM SHEET FOR $250,000 DIP CREDIT FACILITY

**Borrower:**    Hawaii Nui Brewing LLC ("Borrower") as debtor-in-possession in a Chapter 11 Case in the United States Bankruptcy Court for the District of Hawaii ("Bankruptcy Court").

**Lender:**    Hawaii Ohana Brewing LLC or assignee ("Lender").

**Loan Amount and Terms:**    Maximum amount available shall be $250,000 ("DIP Credit Facility") to be funded upon approval of loan by Bankruptcy Court in accordance with the terms herein.

**Availability:**    The DIP Credit Facility will be available in two or more draws, subject to conditions set forth herein. Up to $100,000 shall be immediately available under the DIP Credit Facility upon entry of an interim order by the Bankruptcy Court approving the DIP Credit Facility. Upon entry of a final DIP Order on notice as required by Bankruptcy Rule 4001(c)(2), up to an additional $150,000 shall be available as of the day after the entry of a final DIP Order, including a finding that Lender is a "good faith" lender under Section 364(e) of the Bankruptcy Code. Each draw shall be in an amount not less than $50,000.

**Use of Proceeds:**    The DIP Credit Facility shall be used to pay administrative expenses of the Bankruptcy Proceeding, including, but not limited to, payment for maintenance and preservation of the property of the Debtor's estate, rent, insurance, utility services, operating expenses and court-approved professional fees and expenses as reflected in the Budget attached hereto as **Exhibit "A",** and such other ordinary post-petition expenses as may be approved by Lender.

**Priority and Collateral:**    The DIP Credit Facility shall be (a) given superpriority pursuant to 11 U.S.C. § 364(c)(1) and shall have priority over administrative expenses of the kind specified in 11 U.S.C. §§ 503(b) or 507(b), but subject to a "carve out" of $50,000 for a post-petition retainer for counsel; and (b) secured by a (i) senior lien on any of the Borrower's unencumbered assets now owned or hereafter acquired and (ii) a junior lien on all of Borrower's personal property except avoidance claims of the Borrower's bankruptcy estate.

**Interest Rate:**    Simple interest at the rate of 8% per annum, with interest payable monthly in arrears.

EXHIBIT #6

| | |
|---|---|
| **Maturity:** | DIP Credit Facility shall be due on or before May 24, 2013 unless terminated earlier pursuant to a "DIP Credit Facility Termination Event" as follows: (i) appointment of a Chapter 11 Trustee in the Borrower's bankruptcy case; (ii) dismissal of the Borrower's bankruptcy case; or (iii) conversion of the Borrower's Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code. |
| **Loan Documents:** | Borrower shall execute and deliver, and cause to be executed and delivered to Lender such loan and security agreements, instruments, documents, certificates, and assurances as are reasonable and customary for similar loans. |
| **Fees and Expenses:** | Borrower will pay all reasonable expenses of Lender, including attorneys' fees and costs, incurred by Lender in connection with the DIP Credit Facility and any default/foreclosure and any modification/extension, at maturity. |
| **Governing Law:** | New York |
| **Events of Default:** | Customary defaults including, (a) failure to pay principal, interest, fees and expenses when due; (b) violation of covenants; (c) change of control; (d) dismissal or conversion of the Borrower's Chapter 11 Case; (e) appointment of a chapter 11 trustee; (f) granting of relief from automatic stay to permit foreclosure on or exercise any other remedies with respect to any collateral. |
| **Representations and Warranties:** | Customary representations and warranties including, those mentioned in this Term Sheet and the following: (a) organization, qualification and due authorization of the Borrower; (b) no undisclosed litigation; (c) no breach of laws or regulations; (d) all necessary third party consents have been obtained. |
| **Covenants:** | Customary covenants including, without limitation, the following items: (a) preservation of existence; (b) compliance with applicable laws; (c) maintenance of insurance; (d) delivery of financial statements, projections and cash flow statements; (e) payment of all post-petition obligations when due including all taxes except where contested in good faith. |

Foregoing terms and conditions are hereby acknowledged and accepted on this 11th day of April, 2013

Borrower:

HAWAII NUI BREWING LLC


By: _____   Dated: _____
        Its President


Lender:

HAWAII OHANA BREWING LLC


By: _____   Dated: _____
        Its President

# DRAFT

| | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May |
|---|---|---|---|---|---|---|---|---|
| Opening Cash | $ 8,300.00 | $ (6,350.00) | $ 28,594.00 | $ 3,042.00 | $ (3,084.00) | $ 19,090.00 | $ 31,264.00 | $ 33,902.00 |
| Loan Proceeds | $ 25,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 25,000.00 | $ - | $ - |
| **Subtotal** | $ 33,300.00 | $ 43,650.00 | $ 28,594.00 | $ 53,042.00 | 46,916.00 | $ 44,090.00 | $ 31,264.00 | $ 33,902.00 |
| **SALES REVENUE** | | | | | | | | |
| Bottle Revenue | $ - | $ - | $ - | $ 24,400.00 | 13,500.00 | $ 17,500.00 | $ 17,500.00 | $ 5,500.00 |
| Keg Revenue | $ - | $ 9,450.00 | $ 11,050.00 | $ 7,550.00 | $ - | $ 3,350.00 | $ 20,850.00 | $ 20,850.00 |
| **Total Sales** | $ - | $ 9,450.00 | $ 11,050.00 | $ 31,950.00 | 13,350.00 | $ 20,850.00 | $ 38,350.00 | $ 26,350.00 |
| **TOTAL CASH BEFORE DISBURSE** | $ 33,300.00 | $ 53,100.00 | $ 39,644.00 | $ 84,992.00 | 60,266.00 | $ 64,940.00 | $ 69,614.00 | $ 60,252.00 |
| **EXPENSES** | | | | | | | | |
| Labor | $ 4,930.00 | $ 4,930.00 | $ 4,930.00 | $ 4,930.00 | 4,930.00 | $ 4,930.00 | $ 4,930.00 | $ 4,930.00 |
| General Production Expenses | $ 175.00 | $ 175.00 | $ 175.00 | $ 175.00 | 175.00 | $ 175.00 | $ 175.00 | $ 175.00 |
| Liquor Tax | | | | | | | | |
| Production Supplies | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 |
| Packaging Materials | $ - | $ - | $ - | $ 860.00 | 860.00 | $ 860.00 | $ 860.00 | $ 860.00 |
| Brewing Costs | $ 25,000.00 | $ 25,000.00 | $ 12,375.00 | $ 14,375.00 | 35,000.00 | $ 9,975.00 | $ 9,975.00 | $ 9,975.00 |
| **Total COGS** | $ 30,105.00 | $ 14,916.00 | $ 24,916.00 | $ 28,426.00 | 24,026.00 | $ 24,026.00 | $ 24,026.00 | $ 24,026.00 |
| Salaries & Wages | $ 1,465.00 | $ 1,465.00 | $ 1,465.00 | $ 1,465.00 | 1,465.00 | $ 1,465.00 | $ 1,465.00 | $ 1,465.00 |
| Miscellaneous Employee Expe | $ 20.00 | $ 20.00 | $ 20.00 | $ 20.00 | 20.00 | $ 20.00 | $ 20.00 | $ 20.00 |
| Coasters/Glassware | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| Debt Service | $ - | $ - | $ 2,036.00 | $ - | $ - | $ - | $ 2,036.00 | $ - |
| Communications | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | 65.00 | $ 65.00 | $ 65.00 | $ 65.00 |
| Donations | $ 25.00 | $ 25.00 | $ 25.00 | $ 25.00 | 25.00 | $ 25.00 | $ 25.00 | $ 25.00 |
| Dues & Subs-Admin | $ 40.00 | $ 40.00 | $ 40.00 | $ 40.00 | 40.00 | $ 40.00 | $ 40.00 | $ 40.00 |
| Entertainment | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | 65.00 | $ 65.00 | $ 65.00 | $ 65.00 |
| Equipment Lease | $ 130.00 | $ 130.00 | $ 130.00 | $ 130.00 | 130.00 | $ 130.00 | $ 130.00 | $ 130.00 |
| Event/Promotion Expenses | $ 645.00 | $ 645.00 | $ 645.00 | $ 645.00 | 645.00 | $ 645.00 | $ 645.00 | $ 645.00 |
| General Insurance | $ 315.00 | $ 315.00 | $ 315.00 | $ 315.00 | 315.00 | $ 315.00 | $ 315.00 | $ 315.00 |
| GETax & Gallonage | $ 220.00 | $ 220.00 | $ 220.00 | $ 220.00 | 220.00 | $ 220.00 | $ 220.00 | $ 220.00 |
| Lease | | | | | 7,500.00 | | | |
| Licenses & Fees | $ 15.00 | $ 15.00 | $ 15.00 | $ 15.00 | 15.00 | $ 15.00 | $ 15.00 | $ 15.00 |
| Maint & Repair | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | 250.00 | $ 250.00 | $ 250.00 | $ 250.00 |
| Miscelanous Office Expenses | $ 35.00 | $ 35.00 | $ 35.00 | $ 35.00 | 35.00 | $ 35.00 | $ 35.00 | $ 35.00 |
| Postage/Shipping | $ 50.00 | $ 110.00 | $ 110.00 | $ 110.00 | 110.00 | $ 110.00 | $ 110.00 | $ 110.00 |
| Professional Fees-Legal & Acct | | | 0.00 | 50,000.00 | | | | |
| Professional Fees-Baker | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 |
| Professional Fees-IT | $ 25.00 | $ 25.00 | $ 25.00 | $ 25.00 | 25.00 | $ 25.00 | $ 25.00 | $ 25.00 |
| Quality A&C | $ 15.00 | $ 15.00 | $ 15.00 | $ 15.00 | 15.00 | $ 15.00 | $ 15.00 | $ 15.00 |
| Security | $ 15.00 | $ - | $ 60.00 | $ 60.00 | 60.00 | $ 60.00 | $ 60.00 | $ 60.00 |
| Supplies | $ 450.00 | $ 450.00 | $ 450.00 | $ 450.00 | 450.00 | $ 450.00 | $ 450.00 | $ 450.00 |
| Travel | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 |
| Uniforms | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | 50.00 | $ 50.00 | $ 50.00 | $ 50.00 |
| Utilities | $ 3,500.00 | $ 3,500.00 | $ 3,500.00 | $ 3,500.00 | 3,500.00 | $ 3,500.00 | $ 3,500.00 | $ 3,500.00 |
| **Total Expenses** | $ 9,545.00 | $ 9,590.00 | $ 11,686.00 | $ 59,650.00 | 17,150.00 | $ 9,650.00 | $ 11,686.00 | $ 9,650.00 |
| **Total Prod. & General Exp.** | $ 39,650.00 | $ 24,506.00 | $ 36,602.00 | $ 88,076.00 | 41,176.00 | $ 33,676.00 | $ 35,712.00 | $ 33,676.00 |
| Bankruptcy Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Disbursements** | $ 39,650.00 | $ 24,506.00 | $ 36,602.00 | $ 88,076.00 | 41,176.00 | $ 33,676.00 | $ 35,712.00 | $ 33,676.00 |
| **ENDING CASH** | $ (6,350.00) | $ 28,594.00 | $ 3,042.00 | $ (3,084.00) | 19,090.00 | $ 31,264.00 | $ 33,902.00 | $ 26,576.00 |

**EXHIBIT B**