WAGNER CHOI & VERBRUGGE
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: cchoi@hibklaw.com;
      aito@hibklaw.com

Attorneys for Debtor and
Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>HAWAII NUI BREWING LLC,<br><br>    Debtor and<br>    Debtor-in-possession. | Case No. 13-00584<br>(Chapter 11)<br><br><u>Hearing:</u><br><br>Date: May 20, 2013<br>Time: 9:30 a.m.<br>Judge: Hon. Robert J. Faris |

### DEBTOR'S MOTION FOR ORDER AUTHORIZING (A) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS AND ENCUMBRANCES (B) ASSUMPTION AND ASSIGNMENT OF LEASES <u>AND EXECUTORY CONTRACTS; EXHIBITS "A"-"C"</u>

HAWAII NUI BREWING LLC, debtor and debtor-in-possession herein (the

"Debtor"), by and through its undersigned counsel, and pursuant to 11 U.S.C. §§

105(a), 363(b)(1), 363(f), 363(m), 365; Rules 6004 and 6006 of the Fed. R. Bankr.

1

P.; LBR 6004-1, hereby moves this Court for an order to authorize (i) the sale of substantially all of the Debtor's assets and (ii) the assumption and assignment of certain Contracts to HAWAII OHANA BREWING LLC ("Purchaser"), pursuant to the terms of the Purchase and Sale Agreement, substantially in the form attached hereto as Exhibit "A" ("Agreement").[1]

The principal feature of the contemplated sale of Debtor's assets include the following: (a) consideration in the form of (i) release of the Debtor's liability for approximately $332,842.00 of secured debt (including $250,000.00 of post-petition financing); (ii) assumption of certain liabilities in the amount of approximately $444,375.00 plus "cure" obligations; and (iii) a guaranteed cash payment to the estate of $50,000.00 to the extent the Debtor is not holding such amount in cash at closing; (b) assumption and assignment of certain contracts; and (c) closing on or about May 31, 2013, but no later than June 30, 2013.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before the Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Unless otherwise defined, capitalized terms herein have the meaning as set forth for the terms in the Agreement.

## BACKGROUND

3.　　On April 9, 2013 (the "Petition Date"), the Debtor filed an emergency petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4.　　The Debtor continues to operate and manage its business, as debtor-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

## DEBTOR'S FORMATION & OPERATIONS

5.　　The Debtor owns and operates a microbrewery. It was founded in 2007 by two former employees of Kona Brewing Company and an investor. The Debtor bottles various brands of beer under the Mehana, Hawaii Nui and Keoki labels including the "Hapa Brown Ale" and "Kauai Golden Ale."

6.　　The Company currently employs approximately 9 full time and part time hourly employees and approximately 3 salaried employees.

7.　　On average, the Debtor produces approximately 400 kegs of beer and approximately 2,500 bottles of beer per month. Other than retail sales at its warehouse/facility (which generates about $10,000 a month) and occasional sales to Japan (totaling approximately $16,000 per annum), all of the Debtor's production is purchased and distributed by Paradise Beverages, Inc. ("Paradise"),

the largest distributor of alcoholic beverages in the State of Hawaii, pursuant to a Distributor-Supplier Agreement (the "Distributor Agreement").

8. The Debtor's brewery is located at 275 East Kawili Street, Hilo, Hawaii 96720 (the "Brewery") where the Debtor operates Hawaii's only beer bottling line. In addition to the bottling line, the Brewery also serves as a retail and "tasting center".

9. In 2009, the Debtor relocated its brewery operations from Lihue, Kauai to the Hilo Brewery upon a 2009 merger with a Hilo brewery owned by Mehana Brewing Company. In connection with the merger, an entity called Mehana Tea Company ("Mehana") acquired a 50% ownership interest in the Debtor, and the Debtor entered into a lease of the Warehouse with Hilo Soda Works, Inc. ("HSW").

10. The President of HSW is Calvin Shindo. His son Dustin Shindo is the President of Mehana. Until the June, 2011 redemption of Mehana, Calvin and Dustin Shindo were on the Debtor's Board of Managers.

## MEHANA REDEMPTION AND OTHER FINANCING

11. The Debtor has historically operated at a loss, in part due to disagreements among its owners. Motivated in part by a desire to ensure control of the company under then President Keith Kinsey, the Debtor entered into a Redemption Agreement dated as of June 15, 2011 (the

4

"Redemption Agreement")[2] with its 50% owner, Mehana Tea Company.

12. The Redemption Agreement provides for the Debtor to redeem 5,000 membership units from Mehana Tea Company for $350,000.00, with $49,000.00 payable at closing, with the balance (of $301,000.00) to be paid in accordance with a Secured Subordinated Promissory Note dated June 15, 2011 (the "Mehana Redemption Note") and due June 15, 2014.

13. The Mehana Redemption Note is secured by a [subordinated] security interest in substantially all of the Debtor's assets.[3] The Debtor did not have the funds to make the $49,000.00 down payment to Mehana and borrowed funds from Lytton I LLC ("Lytton I"), an entity controlled by Nina Lytton, a member and former manager of the Debtor.[4]

14. On or about February 26, 2013, Mehana Investments, Inc., as assignee of Mehana, commenced an action in the Circuit Court for the First Circuit entitled *Mehana Investments, Inc. vs. Hawaii Nui Brewing, LLC et al.*, Civil No. 13-1-

---

[2] A true and correct copy of the Redemption Agreement is attached hereto as Exhibit "B."

[3] The Debtor disputes the Mehana secured claim and believes the Mehana transaction is avoidable under state and federal law.

[4] Lytton I holds a secured claim totaling $320,000.00. However, Lytton I failed to properly perfect its security interest in the Debtor's assets.

0553-02 (the "Mehana Lawsuit")[5] against the Debtor, Paradise (which holds a senior lien on the Debtor's bottling line and certain kegs), and First Hawaiian Bank, the Debtor's primary secured creditor, seeking, among other relief, to foreclose on Mehana's purported collateral based on an outstanding balance of approximately $341,000.00, due on the Mehana Redemption Note.

15. By August, 2012, the Debtor's cash flow had deteriorated to the point that Paradise arranged for shipments of grain and bottles to the Debtor on Paradise's credit on condition that the Debtor repay Paradise within 59 days. As a result, Paradise holds an unsecured claim in the estimated amount of $149,000.00 in this case.

16. On or about December 31, 2012, HSW filed that certain action entitled *Hilo Soda Works, Inc. v. Hawaii Nui Brewing LLC*; Case No. 3RC 12-1-1274 (the "Eviction Proceeding") in the District Court of the Third Circuit, North and South Hilo Division for the State of Hawaii ("Hilo Court"). The Eviction Proceeding asserts claims by HSW against the Debtor for non-payment of approximately $59,000 in back rent due, and other claims.[6]

---

[5] The Debtor intends to remove the Mehana Lawsuit to the Bankruptcy Court.

[6]. The Debtor has deposited monthly rent for March and April in the amount of $7,527.56 per month (for a total of $15,055.52) into a Rent Trust Fund administered by the Hilo Court.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed   04/22/13   Page 6 of 100

## EFFORTS AT A NON-BANKRUPTCY WORKOUT

17.    Prior to the Petition Date, the Debtor sought investors from sources in Hawaii and elsewhere without success.  For more than six months prior to the Petition Date, an investment group from the East Coast conducted extensive due diligence on the Debtor and even met with the major stakeholders, including Paradise, HSW and Mehana to attempt to restructure the Debtor's finances without a bankruptcy filing.

18.    The East Coast investment group approached Mehana and HSW about restructuring the Redemption Agreement and extending the Brewery lease, respectively.  Unfortunately, these efforts failed and the East Coast investment group and the Debtor began negotiating a potential bankruptcy sale as a viable alternative to closing down the business while the Debtor continued to explore non-bankruptcy alternatives.

19.    Until immediately before the Petition Date, the Debtor believed that the East Coast investment group would: (a) extend DIP financing to the Debtor in a chapter 11 case; and (b) serve as the stalking horse for a section 363 sale of the Debtor's assets.  However, the East Coast investment group was unable to formally commit to fund the Debtor's chapter 11 operations.

7

20.    The emergency chapter 11 filing was necessary to stay trial on the Eviction Proceeding and to give the Debtor an opportunity to sell its assets for the benefit of the estate and its creditors.

DEBTOR'S ASSETS, LIABILITIES AND CONTRACTS

21.    The Debtor has outstanding accounts payable (excluding the secured creditors identified below), totaling approximately $533,487, plus approximately $28,500 owed to its former President, Keith Kinsey.

22.    In addition, the Debtor's secured creditors are as follows: [7]

a.    First Hawaiian Bank ("FHB"), which holds a senior blanket lien on substantially all of the Debtor's assets pursuant to a UCC Financing Statement filed with the State of Hawaii Bureau of Conveyances ("Bureau") on January 27, 2009, to secure a commercial line of credit with a current outstanding balance of approximately $82,842.08 as of March 31, 2013.

b.    Paradise, which holds a lien on the Debtor's "bottling line" and 247 15.5 gallon steel kegs, 1011 5 gallon kegs pursuant to a UCC Financing Statement filed with the Bureau on April 26, 2011 to secure an obligation with a current outstanding balance of approximately

---

[7] A true and correct copy of the Debtor's UCC Financing Statement Report dated March 27, 2013 is attached hereto as Exhibit "C."

$372,653.36.

   c.  Mehana Investments, Inc., which holds a disputed subordinated blanket lien on substantially all of the Debtor's assets pursuant to a UCC Financing Statement filed with the Bureau on June 17, 2011 to secure a Secured Subordinated Promissory Note dated June 15, 2011 (i.e., the Mehana Investment Note), with a current outstanding balance of approximately $341,000.00.

   d.  HSW, which holds a security interest on a 20 foot refrigerated container and related refrigerated system pursuant to UCC Financing Statement filed with the Bureau on March 19, 2012.[8]

   e.  Lytton I, which holds a disputed lien on certain assets of the Debtor pursuant to a UCC Financing Statement filed with the Bureau on April 24, 2012 to secure shareholder loans (including $70,000 converted equity) totaling approximately $320,000 plus interest.

   f.  Lytton I, which holds a junior lien on substantially all of the Debtor's assets pursuant to a UCC Financing Statement filed with the Bureau on April 2, 2013 to secure new shareholder loans totaling approximately $15,000 (the "Lytton I Secured Loan") in addition to the amount identified above.

---

[8]    The Sale proposed herein excludes the refrigerated container.

23.     Additionally, the Debtor has an equipment lease agreement (the "Equipment Lease") with Wells Fargo Financial Leasing (successor in interest to Hawthorne Pacific Corp. and CitiCapital) in the original principal amount of $24,483.00, which is effectively secured by the forklift covered by its lease.

POST-PETITION DEVELOMENTS

24.     At a hearing held on April 12, 2013, the Court approved, on an emergency basis, interim advances of up to $100,000.00 from the Purchaser of a total of $250,000.00 in proposed financing (the "DIP Loan") over the objection of Mehana and HSW. A final hearing on the DIP financing motion is scheduled for April 29, 2013 at 2:00 p.m.

25.     On April 17, 2013, the Debtor filed its *Motion for Order Approving Bid Procedures for Sale of Substantially All of Debtor's Assets* (the "Bid Procedures Motion"). The Bid Procedures Motion requests the setting of May 16, 2013 as the deadline for the submission of Qualified Bids (as defined in the Bid Procedures Motion) and the payment of a "break up" fee of $25,000.00 to the Purchaser if it is not the successful bidder. The hearing on the Bid Procedures Motion is scheduled for April 29, 2013 at 2:00 p.m.

26.     On April 19, 2013, Mehana and HSW filed a *Motion to Convert Chapter 11 Case to Chapter 7 Case* ("Conversion Motion").

## PROPOSED SALE OF ASSETS AND CONSIDERATION

27.     The terms of the proposed sale are set out in detail in the Agreement. The "Acquired Assets" are defined in Section 2.1 of the Agreement and include, among other things, all of the Debtor's personal property excluding cash and the estate's avoidance claim relating to the Mehana Redemption Agreement. Further, the Agreement calls for the assumption and assignment of certain "Acquired Contracts."

28.     The total consideration paid by the Purchaser under the Agreement consists of the following:

a.  The DIP Loan (expected to be $250,000 at closing);

b.  Payment of a guaranteed "Unsecured Creditor Carveout" of $50,000.00 by September 30, 2013 to the extent the Debtor is not holding such amount in cash at closing;

c.  Satisfaction of the FHB Secured Loan of approximately $82,842;

d.  Assumption of the "Cure Payments";

e.  Assumption of the Paradise Secured Loan of approximately $372,653.36; and

f.  Assumption of the undisputed portion of the Lytton I Secured Loan of $15,000.00.

11

29.     Finally, the Agreement requires the Debtor as Seller to obtain Court approval for certain bid procedures as outlined in the Bid Procedures Motion as a condition to closing.

## RELIEF AND AUTHORITY FOR RELIEF REQUESTED

30.     By this Motion, the Debtor seeks entry of an order ("Sale Order") pursuant to sections 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure authorizing the sale of the Acquired Assets and the assumption and assignment of the Equipment Lease and Distributor Contract (the "Sale") to Purchaser, pursuant to the terms of the Agreement.

31.     As part of the Sale Order, the Debtor also seeks to have the Court determine that the Purchaser is a good faith purchaser within the meaning of Bankruptcy Code section 363(m).

32.     The Court may approve the sale of the Acquired Assets as set forth above pursuant to Bankruptcy Code sections 363(f) and 365.  Under Bankruptcy Code section 363(f), the Court may approve a sale of assets free of the interests of a third party if:

a.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.      such interest in bona fide dispute; or

e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

33.     With respect to the secured creditors:

a.  The DIP lender consents to the sale pursuant to the terms of the Agreement which satisfies section 363(f)(2),

b.  FHB will be paid in full at closing which satisfies section 363(f)(5);

c.  Lytton I consents to the sale which satisfies section 363(f)(2); and

d.  Mehana's secured claim is subject to a bona fide dispute, which satisfies section 363(f)(5).[9]

34.     Accordingly, the sale of the Assets, as set forth in the Agreement, complies with Bankruptcy Code section 363(f).

35.     Property of the bankruptcy estate may be sold outside the ordinary course of business. Bankruptcy Code Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts interpreting section 363(b)(1) of the Bankruptcy

---

[9] The HSW refrigerator is specifically excluded from the subject transaction.

Code have held that transactions should be approved under section 363(b)(1) when: (a) they are supported by the sound business judgment of the Debtor; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987).

36. In connection with the sale of the assets, the Debtor seeks authority for the Debtor to assume and assign to Purchaser the Equipment Lease and Distributor Contract in accordance with the terms of the Agreement.

37. Bankruptcy Court sections 365(a) and 365(f) permit a debtor, subject to court approval, to assume any executory contract or unexpired lease and assign the same to a third party. In order to assume or assign a lease or executory contract, adequate assurance of future performance by the assignee under such lease must be provided. *See* 11 U.S.C. § 365(f)(2)(B). In the Ninth Circuit, the decision to assume or assign an executory contract or unexpired lease is within the reasonable business judgment of the debtor. *See In re Chi-Feng Huang*, 23 B.R. 798 (Bankr. 9th Cir. 1982). The business judgment test requires a showing that the

assumption and assignment will benefit the debtor's estate. *Id*. at 800-801.

38.     The assumption and assignment to the Purchaser of the Equipment Lease and the Distributor Contract will facilitate the successful transfer of the equipment used for operating the business and steady stream of income for completed, brewed product. The Debtor believes that the sale of the Equipment Lease and the Distributor Contract to the Purchaser will benefit the Debtor's estate by providing sale proceeds to pay a portion of the Debtor's obligations.

39.     The Equipment Lease is currently in default. Under Bankruptcy Code section 365(b)(1), a debtor may assume a lease that is in default if (i) the debtor cures, or provides adequate assurances that the debtor will promptly cure, the default, (ii) the debtor compensates, or provides adequate assurances that the debtor will promptly compensate, any other party to the lease or contract for any actual pecuniary loss to such party resulting from the default, and (iii) the debtor provides adequate assurance of future performance under such contract or lease.

40.     With regard to the Equipment Lease, all monetary defaults will be cured at or before Closing of the sale By the Purchaser. The Debtor believes that it owes approximately $1,500.00 in back rent.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 15 of 100

41.     The Debtor is not currently in default under the Distributor Contract. The assumption and assignment of the Distributor Contract (along with the transfer of the Debtor's Assets) will ensure Purchaser with a customer base and steady source of income so long as it continues to brew beer.

42.     Accordingly, the Equipment Lease and Distributor Contract may be assumed by the Debtor and assigned to the Purchaser, pursuant to Bankruptcy Code section 365.

43.     The Debtor submits that there is sound business justification to support the sale of the Acquired Assets and the assumption and assignment of the Equipment Lease and Distributor Contract, including the following:

       a.     The total consideration being received exceeds the value of the Acquired Assets in the Debtor's opinion; and

       b.     The Unsecured Creditor Carveout will ensure that funds will be available to provide a distribution to unsecured creditors.

44.     Under all of the circumstances of this case, the Debtor believes that the Sale by is in the best interests of the estate and its creditors.

45.     Pursuant to Rule 6004(h), the Debtor requests that the Court

waive the fourteen (14) day stay and authorize the closing on the Sale and

consummate the transactions contemplated by the Agreement

immediately upon entry of the Sale Order.

## CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that the Court

approve the Motion and grant such other relief as it deems fair and just.

DATED: Honolulu, Hawaii, April 22, 2013.

/s/ Chuck C. Choi
CHUCK C. CHOI
Proposed Attorney for
Debtor and Debtor-in-Possession

# Exhibit A

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement"), is made as of this 20th day of April, 2013 (the "Effective Date"), by and among **HAWAII NUI BREWING LLC**, as Debtor-in-Possession in Bankruptcy Case No. 13-00584 pending in the United States Bankruptcy Court for the District of Hawaii ("Seller"), and **HAWAII OHANA BREWING LLC**, a Delaware limited liability company ("Purchaser").

## W I T N E S S E T H

WHEREAS, Seller is a brewery engaged in the manufacture and sale of beer under, among other brands "Hawaii Nui Brewing," "Mehana Brewing," and "Keoki Brewing" (collectively, the "Business");

WHEREAS, On April 9, 2013 (the "Petition Date"), Seller commenced a chapter 11 reorganization case, Case No. 13-00584 by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court");

WHEREAS, at an interim hearing held on April 12, 2013, the Bankruptcy Court granted interim approval to allow the Seller to borrow up to $100,000.00 of debtor-in-possession financing from the Purchaser on a super-priority and secured basis, and scheduled a final hearing on April 29, 2013 to consider the Seller's request to borrow up to $250,000.00 from the Purchaser (collectively, the "Purchaser Loans");

WHEREAS, Seller continues to operate its business and manages its properties as debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, certain of Seller's assets, as more fully described herein, free and clear of all Liens, claims and Encumbrances and upon the terms and conditions set forth herein;

NOW, THEREFORE, for and in consideration of the representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE 1

## DEFINITIONS

**1.1**    **Definitions**

    (a)    As used herein, the following terms shall have the following meanings:

"Acquired Assets" has the meaning assigned to that term in Section 2.1 hereof.

"Acquired Contracts" has the meaning assigned to that term in Section 2.1(d).

"Agreement" has the meaning assigned to that term in the Preamble hereto.

"Approval Order" means an Order of the Bankruptcy Court approving the transaction contemplated by this Agreement satisfactory in form and substance to Purchaser.

"Assumed Liabilities" has the meaning assigned to that term in Section 2.3(b).

"Bankruptcy Case" has the meaning assigned to that term in the Recitals hereto.

"Bankruptcy Code" has the meaning assigned to that term in the Recitals hereto.

"Bankruptcy Court" has the meaning assigned to that term in the Recitals hereto.

"Bid Procedures Motion" means that certain Motion for Order Approving Bid Procedures for Sale of Substantially All of Debtor's Asset, filed in the Bankruptcy Court on April 17, 2013 in the Bankruptcy Case as Docket # 23.

"Bid Procedures Approval Order" means an Order of the Bankruptcy Court approving the Bid Procedures Motion.

"Bankruptcy Petition" means the voluntary bankruptcy petition filed by Seller on April 9, 2013 with the Bankruptcy Court.

"Business" has the meaning assigned to that term in the Recitals hereto.

"Business Day" means any day of the year on which national banking institutions in the state of Hawaii are open to the public for conducting business and are not required or authorized to close.

"CERCLA" has the meaning assigned to that term in Section 7.4(b).

"Closing" means the closing of the transactions contemplated by this Agreement.

"Closing Date" has the meaning assigned to that term in Section 4.1.

"Contract" means any contract, indenture, note, bond, lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement, other than a Lease, which is related to the Business and as otherwise provided in Section 2.1(c).

"Cure Payments" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Acquired Contracts.

"Effective Date" has the meaning assigned to that term in the Preamble hereto.

"Encumbrances" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust

or agreement, transfer restriction or similar agreement or any other right of a third party in respect of an asset.

"Environmental Laws" has the meaning assigned to that term in Section 7.4(b).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event of Loss" has the meaning assigned to that term in Section 8.8(a).

"Excluded Assets" has the meaning assigned to that term in Section 2.2.

"Excluded Contracts" has the meaning assigned to that term in Section 2.1(d).

"Excluded Liabilities" has the meaning assigned to that term in Section 2.3(a).

"Facility" means the Seller's beer brewery located at 275 East Kawili Street, Hilo, Hawaii 96720.

"FF&E" means all furnishings, trade fixtures, equipment, supplies, appurtenances and/or improvements to real property.

"FHB Secured Loan" means the secured loan in the approximate amount of $82,842.08 made by First Hawaiian Bank to the Seller which loan is secured by a senior loan on substantially all of the Seller's assets.

"Governmental Entity" means any arbitrator, court, judicial, legislative, administrative or regulatory agency, commission, department, board, bureau, body or other governmental authority or instrumentality.

"In-Transit Inventory" means any inventory for which Seller has pre-paid the respective vendor, which inventory has not been received by the Seller on or prior to the Closing Date.

"Intellectual Property" means any patents and patent rights, trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service name and service name rights, brand names, inventions, processes, formulae, copyrights, business and product names, logos, slogans, trade secrets, industrial models, designs, computer programs, business telephones, facsimile and e-mail addresses, websites and technology, and software (including all source codes) and related documentation, drawings, know-how, methods, processes, technology, engineering specifications, procedures, bills of material, trade secrets, all pending applications for and registrations of patents, trademarks, service marks and copyrights and any other intangible property, including all rights to any such property which is owned by and licensed from others and any goodwill associated with any of the above, including, without limitation, the trade names "Hawaii Nui Brewing" "Mehana Brewing", "Keoki Brewing".

"Knowledge" of an individual means the actual knowledge of such individual. With respect to a Person (other than an individual), "Knowledge" means the actual knowledge of any director, officer, partner or member of senior management of such Person.

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 21 of 100

"Lease" means all unexpired real estate leases, subleases, licenses or other agreements, including all amendments, extensions, renewals, guaranties or other agreements with respect thereto, pursuant to which Seller holds or uses any of the Business.

"Lien" means any lien, security interest, pledge, hypothecation, encumbrance, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement, proxy, voting trust or agreement, transfer restriction, or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 10l(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Acquired Assets (including, but not limited to, any options or rights to purchase such Acquired Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the date of the filing of the Bankruptcy Petition.

"Lytton I Secured Loan" means the $15,000 loaned by Lytton I, LLC to the Debtor on a secured basis in April 1, 2013, secured by a junior lien on substantially all of the Debtor's assets.

"Material Adverse Effect" means the occurrence or failure of an event that could reasonably be expected to have a material adverse effect on the business, operations, results of operations, financial position or prospects of the Business or the value of its properties or assets.

"Merchandise" means all finished goods inventory that is (a) owned by Seller located in the Facility on the Closing Date, and (b) In-Transit Inventory.

"Necessary Consent" has the meaning assigned to that term in Section 2.4.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of any Governmental Entity.

"Purchaser Loans" has the meaning assigned to that term in the Preamble hereto.

"Paradise Secured Loan" means the secured loan (or loans) in the approximate amount of $372,653.36 made by Paradise Beverages, Inc. to the Seller and secured by a senior lien on the Seller's "bottling line" equipment and approximately and 247 15.5 gallon steel kegs and approximately 1011 five gallon kegs.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or Governmental Entity.

"Purchaser" has the meaning assigned to that term in the Preamble hereto.

"Purchase Price" has the meaning assigned to that term in Section 3.1(b).

"RCRA" has the meaning assigned to that term in Section 7.4(b).

"Seller" has the meaning assigned to that term in the Preamble hereto.

"Seller Returns" has the meaning assigned to that term in Section 7.15.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under former Section 59A of the Tax Code or any similar or analogous type of tax), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not. Any variation of, or terms of similar import to, "Tax" (e.g., "Taxable" or "Taxing") shall refer to or mean with respect to Taxes.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Unsecured Creditor Carveout" has the meaning assigned to such term in Section 3.1(d).

"Wages" means the base salary or hourly pay rate an employee is entitled to receive for services rendered to an employer. For purposes of this Agreement, Wages does not include any other form of compensation payable to an employee including but not limited to employer to employee prepaid healthcare, vacation or sick leave pay, or other employee benefits.

## 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars.  Any reference in this Agreement to $ means U.S. dollars.

(iii)    Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(iv)    Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(v)    Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vi) <u>Including</u>. The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

# ARTICLE 2

## SALE AND PURCHASE OF ASSETS

**2.1** <u>**Sale and Purchase of Assets**</u>. On the Closing Date and subject to the terms and conditions set forth in this Agreement, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer and convey to Purchaser, all of Seller's right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances to the fullest extent permitted by Sections 363 and 365 of the Bankruptcy Code. The term "<u>Acquired Assets</u>" means all of Seller's assets, properties, rights and interests of whatever kind or nature, tangible, intangible or personal other than the Excluded Assets, including:

(a) all accounts receivable and amounts due to Seller from customers of Seller for products sold to customers prior to the Closing Date;

(b) the furniture, fixtures, equipment, machinery, supplies and other tangible personal property owned by Seller used in the Facility (collectively, the "<u>Property</u>"), and all warranties, if any, express or implied, existing for the benefit of Seller in connection with the Property;

(c) any licenses, permits, franchises and other authorizations from any governmental entity relating to the assets and to the operation of the Business;

(d) all contracts and agreements ("<u>Acquired Contracts</u>") and rights of Seller used in the operation of the Business, including Inventory and non-Inventory purchase orders for the benefit of Seller, provided, however, that Purchaser may elect not to acquire any one or more of the Acquired Contracts (the "<u>Excluded Contracts</u>") at any time prior to the Closing Date, and Purchaser shall thereupon have no obligations whatsoever to Seller or to the other party or parties to the Excluded Contracts;

(e) the Merchandise inventory (including work in process and raw materials) held for sale by Seller located in the Facility or in-transit;

(f) all books, records, files or papers of Seller, relating to the assets or to the operation of the Business (or an accurate copy thereof);

(g) all of Seller's right, title or interest in or to any of Seller's trademarks, trademark registrations, trademark applications, trade names, logos, copyrights, copyright

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 24 of 100

applications, or copyright registrations relating to the Business, including, without limitation, the trade names "Hawaii Nui Brewing," "Mehana Brewing," and "Keoki Brewing";

(h)     all computer software (programs and code) used by Seller used in the operation of the Business;

(i)     Seller's right, title and interest in and to (including the cash surrender value of) any life insurance policy naming the Company as beneficiary;

(j)     all rights, claims or causes of action of Seller against third parties relating to the Business and/or the Acquired Assets, whether arising out of events occurring prior to, on or after the Closing Date, including any rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller and relating to the Acquired Assets, including for purposes hereof any and all claims and causes of action arising under Sections 544, 545, 547, 548, 549 and 553(b) of the Bankruptcy Code or comparable state law provisions as against suppliers, vendors, service providers, manufacturers and contractors, but excluding causes of action relating exclusively to Excluded Assets;

(k)     all goodwill related to the foregoing;

(l)     all manuals, business forms, marketing, advertising and signage materials, historical financial data (including, but not limited to, all price lists, records of markups and markdowns, advertising records, sales plans, sales records, vendor and supplier lists and all supplies, including bags, packaging and other materials used in the operation of the Facility; and

(m)     all other tangible or intangible assets not expressly identified as Excluded Assets, including but not limited Internet domain names and URLs.

   **2.2     Excluded Assets**.   The Acquired Assets do not include, and the term "Excluded Assets" means:

(a)     all of Seller's cash, including in cash registers at the Facility or in Seller's bank accounts on the Closing Date;

(b)     The 20 foot refrigerated container and related refrigerated system located at the Facility;

(c)     The Excluded Contracts;

(d)     all rights of Seller relating to the under insurance policies relating to claims for losses arising prior to, on or after the Closing Date related to any Excluded Asset;

(e)     all avoidance rights, claims or causes of action of Seller against Mehana Tea Company relating to that certain Redemption Agreement dated as of June 15, 2011 between the Seller and Mehana Tea Company;

(f)     any minute books, stock ledgers, corporate seals and membership certificates of Seller, and other similar books and records that Seller is required by law to retain or that Seller determines are necessary or advisable to retain including Seller Returns, financial statements and corporate or other entity filings; provided, that Purchaser shall have the right to request and receive copies of any Excluded Asset described in this subclause (g);

(g)     any refunds or claims for refunds of income or corporate taxes;

(h)     any good faith or other bid deposit submitted by any third party in connection with the auction of Seller's assets; and

(i)     all rights of Seller under this Agreement.

**2.3     Liabilities.**

(a)     Purchaser shall not assume and Seller shall be solely and exclusively responsible for all debts, liabilities or obligations of Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, other than the Assumed Liabilities (collectively, the "Excluded Liabilities").

(b)     Effective as of the Closing, Purchaser shall assume and shall timely perform and discharge the following liabilities and no others (the "Assumed Liabilities"):

(i)     The Paradise Secured Loan;

(ii)    The Lytton I Secured Loan;

(iii)   The Cure Payments; and

(iv)    Any post-petition payments due under the Facility lease from and after the Closing Date.

**2.4     Non-Assignment of Assets.**     Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder and (b) the Bankruptcy Court shall not have entered an order providing that such Necessary Consent is not required. In such event, Seller and Purchaser will use commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request. If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of Seller thereunder so that Purchaser would not in fact receive all such rights, Seller and Purchaser will cooperate in a mutually agreeable arrangement under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 26 of 100

licensing, or sub-leasing to Purchaser, or under which Seller would enforce for the benefit of Purchaser, with Purchaser assuming Seller's obligations, any and all rights of Seller against a third party thereto.

## ARTICLE 3

## PURCHASE PRICE; ALLOCATION

**3.1** **Purchase Price.** In consideration of Seller's agreement to enter into the transactions contemplated by this Agreement, the Purchaser is prepared to pay Seller (or its designee) the sum of the following transaction consideration:

(a) $250,000.00 payable exclusively by way of a credit bid of Purchaser's interest in the Purchaser Loan under Section 363(k) of the Code;

(b) An amount sufficient to pay the FHB Secured Loan in full at Closing;

(c) The Assumed Liabilities; and

(d) The "Unsecured Creditor Carveout" which shall mean an amount not to exceed $50,000.00 payable by Purchaser to Seller on or before September 30, 2013, and earmarked for the payment of (A) unpaid professional fees of Debtor's counsel, any Committee counsel; and thereafter to (B) prepetition general unsecured claims, on a pro rata basis pursuant to procedures to be approved by the Bankruptcy Court. The Unsecured Creditor Carveout shall only be payable to the extent the Debtor's cash as of the Closing Date is less than $50,000.00, and only to the extent of the difference. For example, if, on the Closing Date, the Debtor's cash equaled $35,000.00, Purchaser's obligation under this clause would be to pay Seller $15,000.00, on or before September 30, 2013.

**3.2** **Allocation of the Purchase Price.** Purchaser shall designate, in writing, an allocation of the Purchase Price (and all other capitalizable costs) among the Acquired Assets for all purposes (including financial accounting and tax purposes) no later than thirty (30) days after the Closing Date. Such allocation shall be used by the parties in completing Internal Revenue Service Form 8594 and in satisfying any and all other reporting requirements of the Internal Revenue Service.

**3.3** **Prorations.** Liability for real and personal property, ad valorem and other Taxes, utility charges and deposits, rents, prepaid expenses, security services and any and all other expenses relating to the Acquired Assets and which are not treated elsewhere herein, will be allocated and prorated between Purchaser and Seller through the Closing Date to reflect the principle that Seller shall be responsible for all expenses arising prior to or on the Closing Date. Any taxes payable in connection with the sale of the Acquired Assets to Purchaser shall be payable by Seller.

## ARTICLE 4

## CLOSING AND BANKRUPTCY COURT APPROVAL

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed 04/22/13  Page 27 of 100

**4.1    Closings.**

        (a)    The closing of the transaction contemplated hereby will take place on May 31, 2013 (the "Closing Date"), provided that all of the conditions set forth in this Agreement, including without limitation those conditions set forth in Articles 9 and 10, have been satisfied or waived by Purchaser. The closing will take place at a location to be mutually agreed upon by Purchaser and Seller. At the closing, Purchaser shall acquire and take title to the Acquired Assets. In the event the closing has not occurred on June 30, 2013, for any reason other than solely as a direct result of a material breach by Purchaser of its obligations under this Agreement, Purchaser will have the right to terminate this Agreement and all related agreements without any further obligation whatsoever.

    **4.2    Court Approval Required.** Seller and Purchaser acknowledge and agree that the Bankruptcy Court's entry of the Approval Order and the Bid Procedures Approval Order is required in order for Seller and Purchaser to consummate the transactions contemplated hereby and that the requirement that the Approval Order and the Bid Procedures Approval Order be entered is a condition that cannot be waived by either party.

## ARTICLE 5

## DELIVERIES AT CLOSINGS

**5.1    Deliveries by Seller.**

        (a)    At the closing, Seller shall deliver or cause to be delivered to Purchaser the following (each in form and substance reasonably satisfactory to Purchaser):

        (i)    duly executed assignments, patent assignments, general trademark assignments, bills of sale or certificates of title, dated the Closing Date, transferring to Purchaser all right, title and interest in and to the Acquired Assets and the Acquired Contracts free and clear of all Liens, without exception or condition;

        (ii)    a certified copy of the Approval Order which, among other things, pursuant to §§ 363 and 365 of the Bankruptcy Code shall authorize and approve Seller's assumption and assignment of the Acquired Contracts to Purchaser, with such assumption and assignment to be effective as of the Closing Date; and

        (iii)    such other instruments or documents as Purchaser may reasonably request to fully effect the transfer of the Acquired Assets and the Acquired Contracts and to confer upon Purchaser the benefits contemplated by this Agreement.

    **5.2    Deliveries by Purchaser.**

        (a)    At the closing, Purchaser shall deliver, or cause to be delivered, the following:

        (i)    the payment of the Purchase Price under Section 3.1; and

(ii)    such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Acquired Assets and the assumption of the Assumed Liabilities.

(b)    At the subsequent and final closing, Purchaser shall deliver, or cause to be delivered, such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Acquired Assets and assumption of the Assumed Liabilities and to otherwise consummate the transactions contemplated by this Agreement.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**6.1    Organization, Good Standing and Power**.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Purchaser has all requisite corporate power and authority to own, use and operate its properties and to carry on its business as now being conducted.

**6.2    Authority Relative to this Agreement; Execution and Binding Effect**.  The execution, delivery and performance of this Agreement and each other agreement, document or instrument contemplated hereby by Purchaser and the consummation of the transactions contemplated hereby have been duly authorized by the members of Purchaser and, subject to and conditioned upon the entry of the Approval Order and the Bid Procedures Approval Order, no other act or proceeding on the part of Purchaser is necessary to approve the execution and delivery of this Agreement, the performance by Purchaser of its obligations hereunder or the consummation of the transactions contemplated hereby.  This Agreement and each other agreement, document or instrument contemplated hereby has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by Seller) constitutes a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditor's rights and remedies generally.

**6.3    No Breach**.  The execution, delivery and performance by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby will not:  (i) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (x) provision of law, or (y) any agreement, contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (ii) violate the certificate of incorporation or bylaws of Purchaser, other than any such conflicts, breaches, defaults, cancellations, terminations or violations that would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

**6.4** **Governmental and Other Consents**. Except for the Approval Order and the Bid Procedures Approval Order, no consent, notice, authorization or approval of, or exemption by, any Governmental Entity or by any other Person, whether pursuant to contract or otherwise, is required to be obtained by Purchaser in connection with the execution, delivery and performance of this Agreement or any of the instruments or agreements herein referred to or the taking of any action herein or therein contemplated.

**6.5** **No Brokers**. Purchaser has not taken any action that would cause Seller or Purchaser to have any obligation or liability to any person for finders' fees, brokerage fees, agents' commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

## ARTICLE 7

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

**7.1** **Organization, Good Standing and Power**. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Hawaii. Seller has all requisite corporate power and authority to own, use and operate its properties and to carry on its business as now being conducted.

**7.2** **Authority Relative to this Agreement; Execution and Binding Effect**. The execution, delivery and performance of this Agreement and each other agreement, document or instrument contemplated hereby by Seller and the consummation of the transactions contemplated hereby have been duly authorized by the board of directors of Seller in accordance with its governing documents, and subject to and conditioned upon the entry and effectiveness of the Approval Order and the Bid Procedures Approval Order, no other act or proceeding on the part of Seller is necessary to approve the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation of the transactions contemplated hereby. This Agreement and each other agreement, document or instrument contemplated hereby has been duly and validly executed and delivered by Seller and, subject to and conditioned upon the entry and effectiveness of the Approval Order and the Bid Procedures Approval Order (and assuming the due authorization, execution and delivery by Purchaser), constitutes a legal, valid and binding obligation of Seller, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditor's rights and remedies generally.

**7.3** **Title to and Condition of Assets**. Seller has, and at the Closing shall convey to Purchaser, good, valid and marketable title to the Acquired Assets, free and clear of all Liens to the extent provided in the Approval Order. To the Knowledge of Seller, the Acquired Assets constituting tangible property, taken as a whole, in all material respects are in good operating condition and repair, subject to normal wear, are usable in the regular and ordinary course of business and conform in all material respects to applicable laws.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 30 of 100

**7.4    Environmental Matters.**

(a)    To Seller's Knowledge, Seller is not in violation of or default under any Environmental Law, or any order of any Governmental Entity having jurisdiction over Seller.

(b)    Seller has, at all times, complied and is in compliance with, in each case in all material respects, all local, state and federal laws, statutes, ordinances, rules and regulations dealing with the protection of the environment or public health and safety, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act (codified as amended, 42 U.S.C. §§ 9601 et seq.) ("CERCLA"), the Resource Conservation and Recovery Act (codified as amended, 42 U.S.C. §§ 6901 et seq.) ("RCRA"), and comparable state laws (collectively, "Environmental Laws").

(c)    With respect to Seller's business, Seller has obtained all material local, state and federal permits, licenses, certificates and approvals, if any, relating to:  (i) air emissions; (ii) discharges to surface water or groundwater; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation or disposal of toxic or hazardous substances or wastes (intended hereby and hereafter to include any and all such materials listed in any local, state or federal statute, ordinance or regulation); (vi) the use, storage, transportation or disposal of petroleum or petroleum products; and (vii) other environmental, health and safety matters.

(d)    With respect to Seller's business, to Seller's Knowledge, Seller has not caused, suffered, permitted or sustained any emission, spill, release or discharge of any toxic or hazardous substances or wastes, or any petroleum products, in any reportable quantities, into or upon:  (i) the air; (ii) soils or any improvements located thereon, whether on the real property of Seller or elsewhere; (iii) surface water or groundwater; or (iv) a sewer, septic system or waste treatment, storage or disposal system, except in accordance with applicable law or a valid Permit.

(e)    With respect to Seller's business, there are no pending, or to Seller's Knowledge, threatened, actual or potential claims, orders, directives, citations or causes of action based on a violation of any Environmental Law, including, but not limited to, CERCLA, RCRA, or common law claims or causes of action based upon Seller's involvement with or use of any substance regulated by Environmental Laws.

**7.5    No Brokers.**  Seller has not taken any action that would cause Purchaser or Seller to have any obligation or liability to any person for finders' fees, brokerage fees, agents' commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

**7.6    Contracts and Leases.**  To the Knowledge of Seller, each of the Contracts and Leases are valid and enforceable in accordance with their terms, subject to applicable bankruptcy, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity.  Neither Seller, and to the Knowledge of Seller, no other party thereto is, in default in the performance, observance or fulfillment of any obligation under any Contract or Lease (other than payments or amounts due thereunder, which shall be paid or discharged by Seller at or prior to Closing) and, to the

13

Knowledge of Seller, no event has occurred, which with or without the giving of notice or lapse of time, or both, would constitute a default thereunder. True and complete copies of all Contracts and Leases have been delivered to Purchaser.

**7.7    Absence of Certain Changes.** Except as disclosed to Purchaser in writing prior to the Effective Date, or as a result of transactions in the ordinary course of business:

(a)    Seller has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, constituting or related to the Acquired Assets, except for retail sales in the ordinary course of business;

(b)    Seller has not entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) that relates to the Acquired Assets;

(c)    no party (including Seller) has accelerated, terminated, modified, or cancelled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) relating to the Acquired Assets, any Acquired Lease, any Acquired Contract or any Permit;

(d)    Seller has not imposed or consented to the imposition of any Lien upon any of its assets, tangible or intangible;

(e)    Seller has not experienced any damage, destruction, or loss (whether or not covered by insurance) to its property relating to or constituting the Acquired Assets; and

(f)    there has not been any other occurrence, event, incident, action, failure to act, or transaction outside the ordinary course of business involving any of Seller, the Business or the Acquired Assets.

**7.8    Inventory.** All Merchandise consists, and at the Closing Date will consist, substantially of inventory of the kind and quality regularly and currently used in the Business of Seller and has been, and will be, acquired in the ordinary course of business. Seller does not hold any goods, inventory or Merchandise on memo, on consignment or as bailee and no Merchandise belongs to sublessees, licensees or concessionaries of Seller.

**7.9    Compliance With Laws.** To Seller's Knowledge, Seller is not in violation of or the subject of any investigation for violation of, any laws, regulations, or administrative orders, and is otherwise in compliance therewith in all material respects. There is no judgment, writ, decree, injunction, rule, or order of any Governmental Entity outstanding against Seller, its properties or assets, or that would prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement or which would have the effect of prohibiting or impairing any current or future business practice of Purchaser after the Closing Date, or otherwise have a Material Adverse Effect. Seller has complied in all material respects with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of Governmental Entities and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been received or filed or commenced against Seller alleging any failure so to comply. Seller has all Permits required for the operation of the Business as currently conducted.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 32 of 100

**7.10** **Absence of Litigation**. No suit, action or other proceeding (other than the case filed by Seller in the Bankruptcy Court) is pending or, to the best of Seller's Knowledge, threatened before or by any Governmental Entity against Seller with regard to the transaction contemplated hereunder or which could reasonably be expected to materially and adversely affect the value of the Acquired Assets or the Business.

**7.11** **No Breach**. Upon the entry of the Approval Order, the execution, delivery and performance by Seller of this Agreement and each other agreement, document or instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby will not: (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of law, or (ii) agreement, contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Seller is subject or a party or by which it is bound (or with respect to which the Acquired Assets are subject or bound); or (b) violate the certificate of incorporation or other organizational document or bylaws of Seller, in each case which could reasonably be expected to materially and adversely affect the value of the Acquired Assets or the Business.

**7.12** **Governmental and Other Consents**. Except for the Approval Order and the Bid Procedures Approval Order, no consent, notice, authorization or approval of, or exemption by, any Governmental Entity, or by any other Person, whether pursuant to contract or otherwise, is required in connection with the execution, delivery and performance of this Agreement or any of the instruments or agreements herein referred to or the taking of any action herein or therein contemplated, the failure to obtain such could reasonably be expected to materially and adversely affect the value of the Acquired Assets or the Business.

**7.13** **Employee Contracts and Benefits.**

(a) Seller is not a party to or bound by any collective bargaining agreement nor is Seller involved in any labor discussion with any unit or group seeking to become the bargaining unit for any of such Seller's employees, nor is Seller aware of an intention by any such unit or group to commence any organizational activities among Seller's employees. Seller has complied in all material respects with all applicable laws, rules and regulations relating to employment, including those relating to wages, hours, benefits, insurance, collective bargaining, discrimination in employment, sexual harassment, terms and conditions of employment, occupational safety and health and employment practices, unfair labor practices, and the payment and withholding of Taxes and other sums as required by appropriate Governmental Entities.

(b) Except as set forth in Section 3.1(c) above, Purchaser shall have no liability for any amount due or otherwise owing to any employee of Seller arising prior to the Closing for any reason. No employee has, or has asserted, a claim against Seller for any sum due other than salary or bonus payments not yet payable or accrued sick time or vacation time.

(c) Seller neither has now nor will have any liability under any federal, state or local laws, rules and regulations relating to pension benefits, fringe benefits or other employee benefits, including, without limitation under the ERISA or the Consolidated Omnibus Budget

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 33 of 100

Reconciliation Act of 1985, as amended, that could impose any liability on Purchaser or otherwise impact Purchaser or the Acquired Assets after the Closing.

**7.14** **Taxes**. All Tax returns, statements, reports, and forms (including estimated Tax returns and reports and information returns and reports) required to be filed with any Taxing authority with respect to any Taxable period ending on or before the Closing Date, by or on behalf of Seller (collectively, the "Seller Returns"), have been or will be filed when due (including any extensions of such due date).

**7.15** **Product Safety Authorities**. Seller has not been required to file any notification or other report with or provide written information or oral presentation to any Governmental Entity or product safety standards group concerning actual or potential defects or hazards with respect to any product manufactured, sold or distributed by Seller, and there exist no valid grounds for the recall of any such product.

**7.16** **Intellectual Property**. Seller owns or has valid licenses to use all Intellectual Property used or held for use in the Business. No claims are pending against Seller before a Governmental Entity or, to the Knowledge of Seller, threatened with regard to the ownership or use by Seller of any Intellectual Property used or held for use in the Business which could reasonably be expected to materially and adversely affect the value of the Acquired Assets or the Business.

**7.17** **Disclosure**. No representation, warranty or other statement made by Seller herein or in any of the other agreements executed pursuant to this transaction contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements herein or therein not misleading.

**7.18** **Survival of Seller's Representations and Warranties**. Seller's representations and warranties shall survive for a period 24 months following the Closing Date.

## ARTICLE 8

## COVENANTS AND AGREEMENTS

**8.1** **Approval Order**. The final Approval Order shall be subject to review and comment by counsel to Purchaser and Seller, and otherwise be in form and content reasonably satisfactory to Purchaser and Seller.

**8.2** **Transaction Expenses**. Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated hereby are consummated.

**8.3** **Conduct of Business**. From the date hereof until the Closing Date, Seller will conduct the Business in the ordinary and usual course consistent with past practice and will use commercially reasonable efforts to preserve the present (a) business operations, organization and goodwill of the Business and (b) relationships with customers, suppliers and employees of the Business.

16

**8.4** <u>Access</u>. Purchaser and its representatives will have access to Seller's employees, premises, books and records (including, but not limited to, leases, purchase orders, contracts, price lists/schedules and mark down schedules) maintained by Seller with respect to the Acquired Assets during normal business hours until the Closing. In that connection, Purchaser shall be entitled to have one of its representatives present at the Facility to prepare for an orderly transition upon the occurrence of the Closing hereunder.

**8.5** <u>Employee Matters.</u>

(a) Prior to the Closing, Purchaser shall have the right to interview all employees of Seller with the intent of offering to hire a substantial number of employees that meet the employment eligibility requirements of Purchaser. Seller hereby agrees to deliver to Purchaser originals or copies of the personnel records of all employees which Purchaser elects to hire as of the Closing Date. Nothing herein shall be deemed to create any third-party beneficiaries of this Agreement or to constitute an employment agreement or offer of employment.

(b) Seller shall, at its sole cost and expense, bear all responsibility and liability for the termination of the employment of the employees by Seller effective as of the Closing Date. Subject to the obligations of Purchaser under Section 3.1(c) above, such responsibilities and liabilities of Seller shall include, but not be limited to, payment of final payroll, payment of accrued wages, payment of accrued vacation benefits, and, to the extent required by law, payment of accrued holiday pay benefits, bonus and incentive payments, severance payments, pension, profit sharing or retirement benefits, dislocated workers' allowance and all other employment related liabilities, if any.

(c) Seller shall comply with all statutory notices, requirements and obligations applicable to the Seller's employees, including, if applicable, the Hawaii Dislocated Workers' Act (Chapter 394B, Hawaii Revised Statutes), except to the extent pre-empted by federal law, including the Bankruptcy Code, or unless otherwise directed by Bankruptcy Court order.

**8.6** <u>Further Assurances</u>. Purchaser and Seller shall, from time to time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby including the assignment by Seller of such additional contracts and leases of Seller as Purchaser shall reasonably request. If Seller or its agents collect receivables or other funds properly belonging to Purchaser after the Closing Date, Seller shall (and shall cause its agents to) promptly forward such collections or funds to Purchaser.

**8.7** <u>Other Agreements</u>. As and to the extent necessary, Purchaser and Seller shall enter into agreements to allow Seller (or its assignees or designees) access to any books and records (or copies thereof) of Seller, along with access to a copier, which are purchased by Purchaser in order to allow Seller to fulfill its statutory and legal duties with respect to winding down the affairs of Seller's bankruptcy estate.

**8.8** <u>Notifications</u>. From the date of this Agreement until the earlier of the Closing or the termination of this Agreement pursuant to Section 11.1, Seller shall give Purchaser prompt

written notice of the occurrence of any of the following events, to the extent that such events reasonably could be expected to have a Material Adverse Effect:

(a)     any loss, taking, condemnation, damage or destruction of or to any of the Acquired Assets (each, an "Event of Loss");

(b)     the commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Seller affecting the Business or the Acquired Assets;

(c)     any labor grievance, controversy, strike, or dispute affecting the Business or the Acquired Assets;

(d)     any material violation by Seller of any federal, state or local law, statute, ordinance, rule or regulation;

(e)     any notice of a post-petition material breach, default, claimed default or termination of any Contract or Lease;

(f)     any other materially adverse developments with respect to the Acquired Assets or the Business; or

(g)     any event, occurrence or fact that causes any of the representations or warranties contained in Article 7 to be untrue at any time in any material respect; provided, that no disclosure by Seller pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

**8.9     Risk of Loss**. The risk of loss with respect to any Acquired Asset will remain with Seller unless and until the Closing has been consummated in accordance with the terms of this Agreement.  The Closing shall be deemed effective for all purposes as of 12:01 A.M., Hawaii Standard Time, on the first day following the Closing Date.

**8.10     Access to Information**.  Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of Seller, the Acquired Assets and the Business and such examination of the books and records of Seller and the Business, the Acquired Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use reasonable efforts to minimize any disruption to the Business.

- 18 -

**8.11** **Consents.** Seller shall use commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement.

## ARTICLE 9

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF PURCHASER

The obligation of Purchaser to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions (any of which conditions may, subject to Section 4.2, be waived by Purchaser in its sole discretion):

**9.1** **Representations, Warranties and Covenants.** The representations and warranties of Seller contained in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though made on the Closing Date. Seller shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date. Excluding any objections to the entry of the Approval Order or the Bid Procedures Approval Order, no action, proceeding or investigation (including, without limitation, actions, proceedings or investigations commenced or threatened by a Governmental Entity) has been commenced or threatened to prevent, or seek damages as a result of, the execution and delivery of this Agreement or the consummation of any of the transactions contemplated herein (unless such action, proceeding or investigation has been dismissed or otherwise disposed of at least seven days prior to the Closing Date).

**9.2** **Approval Order.** The Bankruptcy Court shall have entered (a) the Bid Procedures Approval Order on or before May 16, 2013; and (b) the Approval Order on or before May 28, 2013. The Approval Order shall be in a form that is reasonably satisfactory to Purchaser, and shall provide, among other things, that any restriction on use of the premises under any Lease, or any other provisions that operate to limit assignment or alienation of any such Lease in contravention of the Bankruptcy Code, are either unenforceable, or are limited in scope and effectiveness to an extent reasonably satisfactory to Purchaser.

**9.3** **Deliveries at Closing.** Purchaser shall have received all documents and other items to be delivered by Seller pursuant to Section 5.1.

**9.4** **Proceedings and Instruments Satisfactory.** All proceedings, corporate or otherwise, required to be taken by Seller prior to or at Closing in connection with the performance of this Agreement, and all documents incident thereto, shall be complete to the reasonable satisfaction of Purchaser and its counsel.

**9.5** **Absence of Proceedings.** No claim, suit, action or other proceeding shall be pending or threatened before or by any Governmental Entity or other entity against any of the parties to this Agreement with respect to the transactions contemplated by this Agreement, except for the proceedings conducted in the Bankruptcy Court related to and arising out of the Bankruptcy Petition.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 37 of 100

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER

The obligation of Seller to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions (any of which conditions, subject to Section 4.2, may be waived by Seller in its sole discretion):

**10.1** **Representations, Warranties and Covenants**.  The representations and warranties of Purchaser contained in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though made on the Closing Date.  Purchaser shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

**10.2** **Approval Order**.  The Bankruptcy Court shall have entered the Approval Order and the Bid Procedures Approval Order.

**10.3** **Deliveries at Closing**.  Seller shall have received all documents and other items to be delivered by Purchaser pursuant to Section 5.2.

## ARTICLE 11

### TERMINATION; EFFECT OF TERMINATION

**11.1** **Termination of Agreement**.  This Agreement may be terminated only as follows:

(a)  by written agreement of Seller and Purchaser at any time;

(b)  by Purchaser, on written notice to Seller, if the Closing shall not have occurred on or prior to June 30, 2013 for any reason other than Purchaser's breach of this Agreement;

(c)  by Purchaser, on written notice to Seller, if one or more of the conditions specified in Article 9 is not satisfied on or prior to the Closing Date or if satisfaction of such conditions is or becomes impossible;

(d)  by Seller, on written notice to Purchaser, if one or more of the conditions specified in Article 10 is not satisfied on or prior to the Closing Date or if satisfaction of such conditions is or becomes impossible; or

(e)  in the event that Purchaser is not the successful bidder for the Acquired Assets in any auction held by the Bankruptcy Court.

**11.2** **Effect of Termination**.  If this Agreement is terminated pursuant to this Article 11 and the transactions contemplated hereby are not consummated, this Agreement shall become null and void and have no further force or effect and no liability shall attach to either of the parties.  Notwithstanding anything in this Agreement to the contrary, the provisions of this Section 11.2, Article 12 and Article 13 shall survive any termination of this Agreement.

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 38 of 100

# ARTICLE 12

## INDEMNIFICATION

**12.1** **Indemnification by Purchaser**. With the exception of any liabilities and obligations specifically retained by Seller, Purchaser will indemnify and hold harmless Seller, its successors and assigns against all liabilities, damages, claims, suits, costs and expenses (including reasonable attorneys' fees and expenses) incurred by any of them which relate to or arise out of or result from the conduct of Purchaser's business with respect to the Facility after the Closing.

**12.2** **Indemnification by Seller**. Seller will indemnify and hold harmless Purchaser, its successors and assigns against all liabilities, damages, claims, suits, costs and expenses (including reasonable attorneys' fees and expenses) incurred by any of them which relate to or arise out of or result from (a) the conduct of the Business and the ownership or operation of the Acquired Assets prior to the Closing and (b) the Excluded Liabilities.

**12.3** **No Limitation on Remedies**. The indemnification provisions of this Article 12 are in addition to, and not in lieu or in derogation of, any other rights or remedies any party may have at law or in equity for a breach of any representations, warranties or covenants contained herein.

# ARTICLE 13

## MISCELLANEOUS

**13.1** **Purchaser as a Good Faith Purchaser**. The parties agree that the Approval Order shall contain findings that: (i) Purchaser is a "good faith Purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms'-length Purchaser; (ii) the Purchase Price is fair and reasonable; (iii) this Agreement was negotiated at arms'-length; (iv) Seller does not have any interest in Purchaser or in any party affiliated with Purchaser; and (v) the sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code

**13.2** **Jurisdiction**. The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof.

**13.3** **Notices**. All notices, demands or documents which are required or permitted to be given or served hereunder shall be in writing and sent by first class, registered, or certified mail, postage prepaid, or by hand delivery, addressed as follows:

To Purchaser: _____
_____
_____

Copy to: _____
_____

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 39 of 100

|                | HAWAII NUI BREWING LLC |
|----------------|------------------------|
| To Seller:     |                        |

_____

_____

Attn: Andy Baker
Phone: (808) _____

Copy to:        WAGNER CHOI & VERBRUGGE
                745 Fort Street, Suite 1900
                Honolulu, Hawaii 96813
                Attn: Chuck C. Choi, Esq.
                Phone: (808) 533-1877
                Fax: (808) 566-6900

These addresses may be changed from time to time by serving notice to all other parties as provided above. Service of such notice or demand shall be deemed complete on the day of actual delivery or at the expiration of the second day after the date of mailing, whichever is earlier.

       **13.4**   **Governing Law**. To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Hawaii, without giving effect to rules governing the conflict of laws.

       **13.5**   **Waiver**. The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case. No waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

       **13.6**   **Severability**. If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

       **13.7**   **Counterparts**. This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

       **13.8**   **Captions; References**. The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

U.S. Bankruptcy Court - Hawaii #13-00584 Dkt # 38 Filed 04/22/13 Page 40 of 100

**13.9    Amendments**.  This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto agree in writing to such amendment, change, modification, alternation or termination.

**13.10   Remedies Cumulative; Specific Performance**.  No remedy herein conferred is exclusive of any other available remedy, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute.  In addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement, each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

**13.11   Binding Nature; Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**13.12   No Third Party Beneficiaries**.  This Agreement is a contract solely between Purchaser and Seller.  No third party beneficiaries, (including, without limitation, employees and customers of Seller) are intended hereunder and none shall be inferred herein; and no party other than Purchaser or Seller may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement.

**13.13   Mutual Cooperation**.  Purchaser and Seller shall work together in good faith to the extent reasonably necessary to facilitate the consummation of the transactions contemplated by this Agreement.  Subsequent to the Closing, each of Purchaser and Seller, at the request of the other, shall execute, deliver and acknowledge such further documents or instruments (including, without limitation, documents or instruments necessary to transfer any of the Intellectual Property to Purchaser), and perform such further acts or deeds, as may be reasonably necessary to consummate the transactions contemplated by this Agreement and carry out the purposes and intent of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective the day and year set forth above.

**HAWAII NUI BREWING LLC,**
a Hawaii limited liability company


By _____
        Andrew K. Baker
        Its President

                                                                    Seller


**HAWAII OHANA BREWING LLC**
a Delaware limited liability company

23

By   _____
      Nina G. Lytton
      Its Manager

24

# Exhibit B

# REDEMPTION AGREEMENT

This REDEMPTION AGREEMENT (this "Agreement"), dated as of June 15, 2011 (the "Effective Date"), is entered into by and among (i) Hawaii Nui Brewing LLC, a Hawaii limited liability company (the "Company"), (ii) Mehana Tea Company, Inc., a Hawaii corporation (the "Redeemed Member"), (iii) solely for purposes of Sections 2.b, 2.c., 5.a, 5.b, 5.c, 5.d, 5.e, 5.f, 5.i, 5.j, 6 and 7 hereof only, Dustin Shindo and Calvin Shindo, (iv) solely for purposes of Sections 2.e, 5.k, 6 and 7 hereof only, Keith T. Kinsey, Lytton I LLC, Andrew K. Baker and Hawaii Holdings, LLC (each, a "Continuing Member" and collectively, the "Continuing Members"), and (v) solely for purposes of Section 6 hereof only, Nina G. Lytton. The term "Members" shall mean the Redeemed Member and the Continuing Members in their capacities as members of the Company, and the term "Member" shall mean each of them.

Capitalized terms used and not otherwise defined in this Agreement shall have the respective meanings given to them in the Second Amended & Restated Operating Agreement of the Company, dated November 30, 2010 (the "Operating Agreement").

WHEREAS, the Redeemed Member is a member of the Company and holder of 5,000 Units in the Company representing a fifty percent (50%) Percentage Interest therein;

WHEREAS, the Redeemed Member has agreed to sell, and the Company has agreed to purchase, effective as of the Effective Date (as defined below), all right, title and interest in and to the 5,000 Units in the Company held by the Redeemed Member and all of the Redeemed Member's right, title and interest to any Membership Interests of the Company (collectively, the "Redeemed Interests"); and

WHEREAS, the Redeemed Member has agreed to cause Dustin Shindo and Calvin Shindo to resign from the Board of Managers of the Company as of the Effective Date, and the Company has agreed to continue to indemnify Dustin Shindo and Calvin Shindo in their respective capacities as former Managers of the Company in the manner set forth in Section 15.1 of the Operating Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Redemption. The Redeemed Member hereby sells to the Company, and the Company hereby purchases from the Redeemed Member, effective as of the Effective Date, all right, title and interest in and to the Redeemed Interests for the aggregate consideration (the "Purchase Price") of Three Hundred Fifty Thousand U.S. Dollars ($350,000), payable as follows:

    a.     Forty Nine Thousand U.S. Dollars ($49,000) shall be paid by the Company to the Redeemed Member on the Effective Date by either certified check or by wire transfer of immediately available funds to an account specified by the Redeemed Member in writing (the "Cash Portion"); and

b.    the Company shall deliver to the Redeemed Member on the Effective Date a duly executed promissory note in the principal amount of Three Hundred One Thousand U.S. Dollars ($301,000), in the form attached as Exhibit A hereto (the "Note").

2.    Effect of Redemption; Shindo Resignation and Indemnification; Tax Matters.

a.    Effective as of the Effective Date at the time at which each of the following three conditions precedent have been satisfied (i) the execution and delivery of this Agreement by each of the parties hereto, (ii) payment by the Company of the Cash Portion to the Redeemed Member, and (iii) execution and delivery to the Redeemed Member of the Note duly executed by the Company, the Redeemed Member shall cease to be a member of the Company for all purposes, shall cease to be a party to the Operating Agreement and shall have no further rights, obligations or liabilities relating to the Company or the Redeemed Member's former capacity as a member of the Company, or under the Operating Agreement, in each case except for the rights, obligations and liabilities expressly set forth in this Agreement (including the provisions of Sections 2.c., 5.a. and 5.c. hereof).

b.    As a condition to the closing of the transactions contemplated by this Agreement, each of Dustin Shindo and Calvin Shindo hereby resigns, effective as of the Effective Date at the time of satisfaction of the three conditions precedent set forth in Section 2.a above, as a Manager of the Company and from any and all other offices or positions he may hold with the Company or any of its direct or indirect subsidiaries.  The Redeemed Member shall have no right to name any replacement Manager(s) or officers as a result of such resignations or otherwise to designate any Manager or officer of the Company from and after the Effective Date.

c.    From and after the Effective Date, the Company shall continue to indemnify each of Redeemed Member, Dustin Shindo and Calvin Shindo with respect to any Proceeding (as defined in Section 15.1 of the Operating Agreement) to which any of them is made party by reason of his capacity as a former Manager or member of the Company, pursuant to and in accordance with the provisions of Section 15.1 of the Operating Agreement (as such provisions are in effect on the Effective Date).  No amendment, modification or termination of Section 15.1 of the Operating Agreement shall adversely affect the rights of Redeemed Member, Dustin Shindo and Calvin Shindo to be indemnified thereunder and hereunder in accordance with the provisions thereof as they are in effect as of the Effective Date.  Notwithstanding the foregoing and for the avoidance of doubt, the indemnification rights of Redeemed Member, Dustin Shindo and Calvin Shindo hereunder and under Section 15.1 of the Operating Agreement shall in no event apply with respect to any Proceeding by the Company against any of them arising from any breach or alleged breach of this Agreement.

d.    The Purchase Price payable for the Redeemed Interests (and any other amounts properly treated as consideration for tax purposes) shall be allocated among the assets of the Company in accordance with the attached Schedule 2(d) (which has been prepared in accordance with Section 1060 of the Code and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate)).  The allocation set forth on Schedule 2(d) shall be binding upon the Company and the Redeemed Member.  The Company and the Redeemed Member shall report, act and file tax returns (including, but not limited to

2

Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation set forth on Schedule 2(d). Neither the Company nor the Redeemed Member shall take any position (whether in audits, tax returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable law. The Company, acting at the direction of the Tax Matters Partner, shall file a stub-year federal income tax return for the taxable period beginning on January 1, 2011 and ending on May 31, 2011 (as if the purchase of the Redeemed Interests had been effected as of such date), which tax return shall include, at the sole discretion of the Company, an election under §754 of the Code. All items of income, gain, loss, deduction and credit of the Company, and all other items attributable to the Redeemed Interests for such taxable period that ended on May 31, 2011 shall be divided and allocated between the Continuing Members and the Redeemed Member by taking into account their varying Percentage Interests during such taxable period in accordance with Code Section 706(d), using the "interim closing of the books" method and such interim closing of the books shall take place for all purposes as of May 31, 2011 (as if the purchase of the Redeemed Interests had been effected as of such date).

        e.     To the extent necessary under the Operating Agreement, the Company and each of the Members hereby approve this Agreement and the transactions contemplated hereby, and waive any applicable rights of first refusal or notice of the transfer of the Redeemed Interests contemplated hereby.

        3.     <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Redeemed Member that:

        a.     The Company has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on its part. This Agreement has been duly executed and delivered by the Company and constitutes its valid and binding obligation, enforceable in accordance with its terms.

        b.     The execution and delivery by the Company of this Agreement does not, and the consummation of the transactions contemplated hereby will not, (i) result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default under, or give rise to a right of termination, cancellation or acceleration of any material obligation or loss of any material benefit under, any contract or other agreement or obligation to which it is a party or by which it or any of its properties or assets may be bound (provided that the consent of First Hawaiian Bank to this Agreement and the transactions contemplated hereby is received on or prior to the Effective Date, which shall be evidenced and confirmed by the Company's delivery of the Cash Portion and Note to the Redeemed Member), or (ii) conflict with or violate any material permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to it or any of its properties or assets.

        c.     No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to the Company in

U.S. Bankruptcy Court - Hawaii #13-00584 Dkt # 38 Filed 04/22/13 Page 46 of 100

connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

        d.      Lytton I LLC, Keith T. Kinsey, Andrew K. Baker and Hawaii Holdings, LLC are the sole members and record and legal owners of the Company, other than the Redeemed Member.

        4.      <u>Representations and Warranties of the Redeemed Member</u>.  The Redeemed Member hereby represents and warrants to the Company that:

        a.      It has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on its part.  This Agreement has been duly executed and delivered by it and constitutes its valid and binding obligation, enforceable in accordance with its terms.

        b.      The execution and delivery by such party of this Agreement does not, and the consummation of the transactions contemplated hereby will not, (i) result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default under, or give rise to a right of termination, cancellation or acceleration of any material obligation or loss of any material benefit under, any contract or other agreement or obligation to which it or he is a party or by which it or any of its properties or assets may be bound, or (ii) conflict with or violate any material permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to it or any of its properties or assets.

        c.      No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to the Redeemed Member in connection with the execution and delivery of this Agreement or the consummation by the Redeemed Member of the transactions contemplated hereby.

        d.      The Redeemed Member is the sole legal owner of the Redeemed Interests and holds the Redeemed Interests free and clear of all liens, pledges, encumbrances and adverse claims.  Other than this Agreement and the Operating Agreement, there are no contracts, agreements, relationships or commitments, written or oral, entered into by the Redeemed Member (or any of its shareholders) relating to the ownership, voting, sale, transfer or other rights of or relating to any of the Redeemed Interests.  Dustin Shindo and Calvin Shindo are the sole legal owners of all of the shares of capital stock of the Redeemed Member and hold such shares free and clear of all liens, pledges, encumbrances and adverse claims.  Upon the execution of this Agreement by the Redeemed Member, the Company will have acquired good and valid title to the Redeemed Interests, free and clear of all liens, pledges, encumbrances and adverse claims.

        e.      The Redeemed Member, either by reason of its capacity prior to the Effective Date as a member of the Company or by reason of its business or financial experience, is a sophisticated seller, is capable of evaluating the merits and risks of the repurchase and

4

redemption contemplated by this Agreement and has the capacity to protect its own interests in connection with the repurchase contemplated by this Agreement.

      f.     The Redeemed Member has received financial statements of the Company for the periods ended December 31, 2010 and March 31, 2011 and has reviewed additional information they consider necessary or appropriate in making an informed decision whether to consummate the repurchase and redemption contemplated by this Agreement. The Redeemed Member acknowledges that it is aware that any future sale or issuance of Units or other Membership Interests of the Company could be at a premium to the purchase price for the Redeemed Interests set forth herein, and such sale or issuance could occur at any time or not at all.

      g.     The Redeemed Member has independently and without reliance upon the Company, except for the representations and warranties made or incorporated herein, and based on such information as it has deemed appropriate, made its own analysis and decision to sell the Redeemed Interests and enter into this Agreement. The Redeemed Member acknowledges that (i) it has not relied in any way upon any act, representation, statement or omission of the Company (other than those expressly set forth in Section 3 hereof and in Exhibit A to the Note) with respect to the business, financial affairs or prospects of the Company or the value of the Redeemed Interests in making its investment decision to sell the Redeemed Interests and (ii) the Company has not given it any investment advice or opinion as to whether the sale of the Redeemed Interests is prudent.

    5.    <u>Additional Agreements and Covenants</u>.

      a.     <u>Publicity; Non-Disclosure of Confidential Information</u>. Except as otherwise expressly provided for herein, the terms of this Agreement shall be maintained in confidence by each of the parties hereto and their respective employees, directors, agents, attorneys, financial advisors, and accountants. All public announcements, notices or other communications regarding such matters to third parties shall require the prior approval of the Company and the Redeemed Member; provided, however, that, notwithstanding anything in this Agreement to the contrary, the terms hereof may be disclosed (a) by the Company and the Redeemed Member to their respective boards of managers, directors or other governing body, which board of managers, directors or governing body shall not make any other disclosure relating to this Agreement without the prior consent of the Company and the Redeemed Member; (b) by the Company to its Continuing Members, and by the Redeemed Member to its members, and to their respective lenders and potential lenders and investors; and (c) to the extent required by order of any governmental authority or otherwise required by law provided that the party so required shall first notify the other parties hereto of such requirement, permit the other parties hereto to contest such requirement, and cooperate with the other parties hereto in limiting the scope of the proposed disclosure and/or obtaining appropriate further means for protecting the confidentiality of such disclosure. Each of the Redeemed Member, Dustin Shindo and Calvin Shindo shall continue to abide by the provisions of Section 4.6(b) of the Operating Agreement (as in effect on the Effective Date) following the Effective Date, in accordance with its terms,

<div align="center">5</div>

with respect to any Confidential Information of the Company received or possessed by any of them.

      b.    <u>Non-Disparagement</u>. Each of the Redeemed Member, Dustin Shindo and Calvin Shindo shall not make (and shall not permit any of its or his employees, managers, shareholders or Affiliates to make) any public statement that might damage the reputation of the Company, or any of its Continuing Members or their respective Affiliates, including any public comments, statements, or writings critical or disparaging of the Company or such Continuing Members or their Affiliates; provided, however, that nothing in the foregoing shall prohibit the Redeemed Member, Dustin Shindo, Calvin Shindo or their employees, managers, shareholders or Affiliates from giving truthful testimony to the extent required by applicable law or legal process. The Company shall not make (and shall not permit any of its employees, managers, members or Affiliates to make) any public statement that might damage the reputation of the Redeemed Member, or any of its shareholders, Dustin Shindo, Calvin Shindo or their respective Affiliates, including any public comments, statements, or writings critical or disparaging of any of the Redeemed Member, its shareholders, Dustin Shindo, Calvin Shindo or their Affiliates; provided, however, that nothing in the foregoing shall prohibit the Company or its employees, managers, members or Affiliates from giving truthful testimony to the extent required by applicable law or legal process.

      c.    <u>Non-Competition and Non-Solicitation Covenants</u>. For a period of two (2) years following the Effective Date, each of the Redeemed Member, Dustin Shindo and Calvin Shindo shall not, directly or indirectly, whether alone or as a partner, officer, director, independent contractor, agent, employee or stockholder of any Person, engage anywhere in the Restricted Area in any business or other commercial activity involving or related to the alcoholic beverage, brewery, restaurant (but only to the extent such restaurant serves alcohol) or pub industries. The foregoing restriction shall not apply to the Redeemed Member's, Dustin Shindo's or Calvin Shindo's ownership of publicly traded securities of a competitive business that represents less than two percent (2%) of the ownership interests of the issuer at the time of acquisition. This provision shall supersede any other agreements or provisions regarding noncompetition, including Section 4.4 of the Operating Agreement (as in effect on the Effective Date). For the avoidance of doubt, nothing in this Agreement or in the Operating Agreement shall prevent or limit the Redeemed Member, Dustin Shindo or Calvin Shindo from engaging or participating in the non-alcoholic beverage industry. In addition, each of the Redeemed Member, Dustin Shindo and Calvin Shindo shall continue to abide by the provisions of Section 4.5 of the Operating Agreement (as in effect on the Effective Date), in accordance with its terms, for a period of three (3) years following the Effective Date. Each of the Redeemed Member, Dustin Shindo and Calvin Shindo acknowledges and agrees that the foregoing restrictions on competition and solicitation set forth in this Section 5.c., and the restrictions on disclosure of Confidential Information of the Company set forth in Section 5.a. above, are necessary, reasonable and appropriate for the Company to protect and maintain the value and confidentiality of its trade secrets and other Confidential Information of the Company, as well as to protect the value of the Redeemed Interests repurchased and redeemed by the Company hereunder. This Section 5.c shall terminate and be of no further force or effect if (i) there is an Event of Default under the Note and the Redeemed Holder, or its permitted assignee, elects to accelerate the

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 49 of 100

payments of principal and interest under the Note and the Note is not paid in full subject to and in accordance with the provisions of any Senior Lender Subordination Agreement (as defined in the Note), or (ii) the Company permanently ceases to do business, or dissolves, liquidates or winds up its affairs, in each case other than following a Liquidity Event in which the Note is paid in full in accordance with the provisions of Section 4 thereof.

   d. <u>Use of Mehana Name and Marks</u>. At all times following the Effective Date, each of the Redeemed Member, Dustin Shindo and Calvin Shindo shall not, directly or indirectly, whether individually or in conjunction with any other Person, use the name "Mehana", or any trade names or marks that include "Mehana", alone or in combination with other words, in any manner in the beverage (whether alcoholic or non-alcoholic), brewery, restaurant or pub industries, without the express prior written consent of the Company. The Redeemed Member agrees that it shall promptly, and in any event within ninety (90) days following the Effective Date, change its name to either remove the word "Mehana" or the word "Tea" therefrom, in order to comply with the provisions of the immediately preceding sentence, and will file all necessary documentation with the State of Hawaii and other authorities necessary to effect such name change. This Section 5.d shall terminate and be of no further force or effect if (i) there is an Event of Default under the Note and the Redeemed Holder, or its permitted assignee, elects to accelerate the payments of principal and interest under the Note and the Note is not paid in full subject to and in accordance with the provisions of the provisions of any Senior Lender Subordination Agreement (as defined in the Note), or (ii) the Company permanently ceases to do business, or dissolves, liquidates or winds up its affairs, in each case other than following a Liquidity Event in which the Note is paid in full in accordance with the provisions of Section 4 thereof.

   e. <u>Use of Shindo and Hilo Soda Works Names and Marks</u>. Subject to the following provisos, the Company hereby agrees that, at all times following the Effective Date, it shall not, directly or indirectly, whether individually or in conjunction with any other Person, use the names "Shindo" or "Hilo Soda Works", or any trade names or marks that include "Shindo" or "Hilo Soda Works", alone or in combination with other words, in any manner in the production, sale, promotion or marketing of the Company's products or services or in the promotion of the business of the Company, without the express prior written consent of the Redeemed Member; provided, however, that (i) the foregoing shall in no event prevent or restrict the Company from using the factual statements regarding the history of the Company's business that have been mutually agreed and approved by the parties for use by the Company following the Effective Date and that are set forth on <u>Exhibit B</u> hereto, (ii) the Company shall have a period of not less than ninety (90) days following the Effective Date to remove all other references to the "Shindo" and "Hilo Soda Works" names, besides the statements set forth on <u>Exhibit B</u>, that are contained on any websites or blogs owned or controlled by the Company, and (iii) the Company shall have the right to continue to use all existing labels and labeling for the Company's products that do or may contain the "Shindo" or "Hilo Soda Works" names or marks and that were manufactured prior to the Effective Date, until the entirety of such existing inventory of labels or labeling has been used and exhausted.

7

f.     FHB Guaranty.  The Company shall use its commercially reasonable efforts to cause Dustin M. Shindo Trust (the "Trust") to be released, on or prior to January 31, 2012, from its obligations under the Commercial Guaranty, dated May 18, 2010, executed by Dustin Shindo as trustee of the Trust in favor of First Hawaiian Bank and guaranteeing the Company's payment and performance obligations under its credit facility with First Hawaiian Bank (the "FHB Guaranty").  In the event that the Company is unable to obtain the release of the FHB Guaranty by January 31, 2012, then for each full calendar month thereafter that the FHB Guaranty remains outstanding, the Company shall pay Three Thousand Dollars ($3,000) to Dustin Shindo, as trustee and on behalf of the Trust, as a fee for providing the FHB Guaranty. Dustin Shindo agrees (i) to donate and pay all such monthly fees received from the Company in respect of the FHB Guaranty to a 501(c)(3) charitable organization selected by him within 60 days of his receipt thereof, and (ii) to provide the Company with written evidence of his payment to charity of such monthly fee amounts promptly following his payment thereof.  Dustin Shindo also hereby agrees, in his individual capacity and as trustee of the Trust, to cooperate, and to cause the Trust to cooperate, in good faith with the Company in its efforts to secure the release of the FHB Guaranty, and to execute and deliver such additional documents, instruments and assurances and take such further actions as may be reasonably requested by the Company to effect the release of the FHB Guaranty, provided that the foregoing shall in no event require the Trust or Dustin Shindo to provide any replacement guaranty to the FHB Guaranty or otherwise pay any amount to First Hawaiian Bank (unless such amount is actually paid by the Company). The Company agrees to defend, indemnify and hold harmless Dustin Shindo, the Trust and their respective Affiliates, representatives and agents from and against any claim, debt, expense and/or liability arising out of the enforcement FHB Guaranty.

g.     Company Management Compensation. Until such time as the Note is paid in full to the Redeemed Member and terminated, the Company hereby agrees not to increase the annual salary and bonus paid to Keith Kinsey and Andy Baker above the respective aggregate salary and bonus most recently approved by the Board of Directors of the Company prior to the resignations of Dustin Shindo and Calvin Shindo from the Board of Directors, without the express prior written consent of the Redeemed Member.

h.     Operating Agreement.  The parties agree and acknowledge that simultaneously with the Effective Date, the Operating Agreement will be amended and restated to, among other things, reflect that as of the Effective Date, the Redeemed Member is no longer party to such Operating Agreement, and shall not have any right, liability or obligation under or with respect to the Operating Agreement, in each case except as expressly set forth in this Agreement (including the provisions of Sections 2.c., 5.a. and 5.c. hereof).  The Company will provide a copy of any such amendment, and any future amendments of the Operating Agreement (until all payments under the Note are paid in full) promptly but in any event within five (5) days after it is executed.

i.     Further Assurances. Following the Effective Date, each of the parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be

8

U.S. Bankruptcy Court - Hawaii  #13-00584   Dkt # 38   Filed  04/22/13   Page 51 of 100

reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

        j.    <u>Injunctive and Equitable Relief</u>. The covenants and undertakings contained in this Section 5 relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Section 5 will cause irreparable injury to the non-breaching party or parties, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Accordingly, the remedy at law for any breach of this Section 5 will be inadequate. Therefore, each party will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 5 by any other party hereto without the necessity of proving actual damages or posting any bond whatsoever. The rights and remedies provided by this Section 5, and elsewhere in this Agreement, are cumulative and in addition to any other rights and remedies which any non-breaching party may have hereunder or at law or in equity.

        k.    <u>Option to Acquire</u>. As a material inducement to the Redeemed Member to enter into this Agreement, solely in the event that each of the following conditions exists (i)(a) an Event of Default (as defined under the Note) arising under Section 7.c or 7.d of the Note has resulted in the acceleration of the principal and interest due thereunder (and, in the case of an Event of Default resulting from any involuntary case referenced above in Section 7.c or Section 7.d of the Note, at least two creditors of the Company other than the Redeemed Holder, Hilo Soda Works, Inc. or any of their respective shareholders, Affiliates, successors or assigns must be party to the application for such involuntary case), or (b) an Event of Default arising under Section 7.e of the Note has resulted in the acceleration of the principal and interest due thereunder and remains uncured for a period of thirty (30) days thereafter, (ii) if, and only if, requested in a written notice by the Company to the Redeemed Member received by the Redeemed Member within three (3) business days following an Event of Default set forth in the preceding clause (i)(a) or within fifteen (15) days following an Event of Default set forth in the preceding clause (i)(b), the Company and the Redeemed Member shall cooperate in good faith to submit such Event of Default set forth in the preceding clause (i) and any Dispute pertaining thereto to two one-day non-binding mediation sessions before an independent third party mediator, which mediation shall take place (a) within 10 business days following the occurrence of an Event of Default described in Section 5.k(i)(a) above, or (b) prior to the expiration of the 30-day cure period following the occurrence of an Event of Default described in Section 5.k(i)(b), and such Event of Default or Dispute pertaining thereto shall not have been cured or resolved to the mutual satisfaction of the parties pursuant to such mediation or such mediation shall not have occurred within the applicable time period set forth in the preceding clause (a) or (b) notwithstanding the good faith cooperation of the parties, *and* (iii) the Note (including all principal, accrued interest and any other amounts due pursuant thereto) has not been paid in full, then in such event the Members of the Company agree that the Redeemed Member or its designee shall have the right, but not the obligation, to elect to acquire all of the outstanding equity interests of the Company for no additional consideration (the "<u>Option</u>"). Such election shall be made in writing and shall be effective when given to the Company (with copies to each of the Members) in accordance with the express provisions of this Section 5.k and Section 7.e below. The condition set forth in clause (ii) above shall be deemed to have been fully satisfied

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 52 of 100

or waived if the Redeemed Member does not receive the written notice from the Company of its request for the mediation within the three (3) business day period referred to therein or, if such notice is timely given by the Company and received by the Redeemed Member, if the Redeemed Member proposes to be and actually makes itself available for such mediation on at least two business days (of the Redeemed Member's choice), which need not be consecutive, following its receipt of such written notice from the Company requesting the mediation and before the expiration of the applicable time period set forth in clause (ii)(a) or (ii)(b) above. By executing this Agreement, each of the Members irrevocably designates and appoints the Redeemed Member as its true and lawful attorney, in its name, place and stead to make, execute, sign, and file such instruments, documents, or certificates that may from time to time be required to carry out, effectuate and/or evidence the provisions of this Section 5.k. Each Member represents and warrants that such Member holds units of equity in the Company free and clear of all liens, security interests and encumbrances, and agrees not to create, approve or permit to exist any lien, security interest or encumbrance on such equity for so long as there are any payments due under the Note. No transfer of units or equity of the Company by any Member shall be valid unless the transferee agrees in writing to be bound by the provisions of this Section 5.k. Any certificate representing units held by a Member shall include a legend disclosing the restrictions of this Section 5.k. Upon the transfer of the Company's outstanding equity interests to the Redeemed Member pursuant to this Section 5.k, (i) the Note shall be cancelled in full and of no further force or effect, and (ii) any and all indebtedness of the Company to the Continuing Members and their permitted assignees and Affiliates shall immediately be reduced (on a pro rata basis in accordance with the respective amounts owed by the Company thereto) to and capped at an aggregate amount equal to the sum of (A) Forty Nine Thousand U.S. Dollars ($49,000) plus (B) the aggregate amount of all principal payments made by the Company to the Redeemed Member (and to any transferees of the Redeemed Member's rights or interests under the Note) under the Note. If at any time following the exercise of the Option by the Redeemed Member under this Section 5.k, the Option is rescinded, deemed ineffective or invalidated, whether upon the insolvency, bankruptcy, or reorganization of the Company, the operation of the Hawaii Revised Statutes, by court order, administrative order, settlement, or otherwise, the obligations of the Company under the Note shall continue to be effective or be reinstated, as the case may be, and shall continue as if the Option had never been exercised, and the Company shall remain liable for the full amount and complete performance of all obligations under the Note as though the Option had never been exercised, notwithstanding any termination of the Note or the cancellation of any obligations thereunder, and ownership of the Company's outstanding equity interests shall revert to the Continuing Members as if the Option had never been exercised.

6. <u>Mutual Release</u>.

a. In further consideration of this Agreement, and except for those obligations created by or arising out of this Agreement (or the specific sections of the Operating Agreement incorporated by reference herein), the Company and each of its Continuing Members and Nina G. Lytton, on the one hand, and the Redeemed Member, Dustin Shindo and Calvin Shindo, on the other hand, on behalf of themselves and, as applicable, each of their predecessors, parents, direct and indirect subsidiaries, and Affiliates, and each of their respective officers, employees, directors, shareholders, partners, agents, attorneys, insurers, accountants, heirs,

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 53 of 100

executors, administrators, conservators, and successors and assigns (the "Releasing Parties"), hereby fully and forever release and discharge one another and, as applicable, each of their predecessors, parents, direct and indirect subsidiaries, and Affiliates, and each of their respective officers, employees, directors, shareholders, partners, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and permitted assigns (collectively, the "Releasees") from any and all claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders, and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, which have existed or may have existed, or which do exist, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring through the Effective Date that, directly or indirectly, arise out of, relate to, are connected with, occasioned by, involve any information obtained in connection with or as a result of, or have any nexus of any nature whatsoever with, the Company or the operations or management thereof (hereinafter referred to as a "Claim" or collectively, the "Claims").

        b.    The Releasing Parties acknowledge that there is a possibility that subsequent to the execution of this Agreement, they will discover facts or incur or suffer claims specifically related to the Claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by them at that time may have materially affected their decision to execute this Agreement. The Releasing Parties acknowledge and agree that by reason of this Agreement, and the releases contained in the preceding paragraph, they are assuming any risk of such unknown facts and such unknown and unsuspected claims specifically related to the Claims. The Releasing Parties have been advised that the laws of certain jurisdictions may provide in substance as follows:

    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Notwithstanding such provisions, this release shall constitute a full release of the Claims in accordance with its terms. Accordingly, to the extent that the provisions of any law substantially similar to that which is quoted above is applicable to this Agreement, the parties knowingly and voluntarily waive such provisions and acknowledge and agree that this waiver is an essential and material term of the releases and waivers set forth herein. This waiver includes, but is not limited to, a waiver of the right to a claim of fraudulent inducement to enter into this Agreement as to such unknown facts and such unknown and unsuspected claims, except that it shall not include a waiver of the right to a claim of (i) misrepresentation as to any of the representations and warranties contained in this Agreement, or (ii) breach of any of the agreements, obligations or covenants contained in this Agreement.

        7.    <u>General Provisions</u>.

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 54 of 100

a. <u>Dispute Resolution</u>. Except for disagreement, dispute or claim arising under Section 5.k of this Agreement or under the Note, and except as otherwise expressly provided in this Agreement, in the event any disagreement, dispute, or claim (collectively, a "Dispute") arises between or among the parties hereto with respect to the enforcement or interpretation of any term or provision of this Agreement or the Note, such Dispute shall be resolved in the following manner: (i) representatives of the Company, on the one hand, and of the Redeemed Member, on the other hand, will meet to discuss and attempt to resolve the Dispute; (ii) if the Dispute is not resolved as contemplated by clause (i), the Company and the Redeemed Member will, by mutual consent, select an independent third party to mediate such Dispute, provided that such mediation will not be binding upon any of the parties; and (iii) if such Dispute is not resolved as contemplated by clauses (i) or (ii) for any reason, whether or not the procedures referred to above have been completed, within thirty (30) days after written notice of the Dispute from any party to another party, either party may initiate a Proceeding in the state or federal courts located in Honolulu, Hawaii as set forth below in Section 7.b; provided, however, that the parties shall use their commercially reasonable efforts to meet for at least one day of mediation pursuant to the preceding clause (ii) within 30 days after delivery of written notice of the Dispute if such mediation is requested by any party hereto.

b. <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Hawaii applicable to contracts to be performed entirely within Hawaii by residents of Hawaii, without giving effect to any choice or conflict of law provision or rule (whether of the State of Hawaii or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Hawaii. The sole forums for resolving any Dispute that was not resolved in accordance with the provisions of clauses (i) or (ii) of Section 7.a. shall be the state or federal courts located in Honolulu, Hawaii and all related appellate courts and each of the parties hereby irrevocably consents and submits to the jurisdiction of such courts, and agrees that venue shall be in Honolulu, Hawaii, and waives any objection based on *forum non conveniens* or other grounds. Each party agrees that personal jurisdiction over it or him may be effected by service of process in accordance with Section 7.e. and that when so made shall be as if served upon it or him personally within the State of Hawaii.

c. <u>Survival</u>. Except as otherwise expressly provided in this Agreement, the representations, warranties, covenants, agreements and obligations of the parties in this Agreement shall survive the Effective Date in perpetuity, unless an express expiration date therefor is provided herein.

d. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns. The Agreement may not be assigned without the consent of each other party hereto.

e. <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given upon (i) personal delivery, (ii) delivery by a nationally recognized overnight courier service (with tracking capability), or (iii) delivery by registered or certified mail, postage and charges prepaid, return receipt requested, in each case addressed to

12

the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

   (i)  if to the Company, any Continuing Member or Nina G. Lytton, to:

     Hawaii Nui Brewing LLC
     275 East Kawili Street
     Hilo, HI 96720
     Attention: Keith Kinsey

     with a copy to:

     Nina Lytton
     24 West Cedar St
     Boston, MA 02108

   (ii)  if to the Redeemed Member, Dustin Shindo or Calvin Shindo, to:

     Mehana Tea Company, Inc. (until name is formally changed)
     1260 Honua Street
     Hilo, HI 96720
     Attn: Dustin Shindo & Calvin Shindo

     with a copy to:

     Dustin Shindo
     One Puuikena Drive
     Honolulu, Hawaii 96821

 f.  <u>Interpretation</u>.

   (i)  When a reference is made in this Agreement to a Section or Exhibit, such reference shall be to a Section or Exhibit to this Agreement unless otherwise indicated. The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."

   (ii)  Every covenant, term, and provision of this Agreement shall be construed and interpreted simply according to its fair meaning and shall not be construed or interpreted for or against any party that drafted or caused its legal counsel to draft such covenant, term, or provision.

   (iii)  The phrase "paid in full" with respect to the Note, and any similar phrase or term, shall mean that the Company has paid all principal and accrued interest, if any, and all other payments at any time owed on this Note (including any costs and expenses payable in respect of any Event of Default pursuant to Section 7 of the Note).

U.S. Bankruptcy Court - Hawaii #13-00584 Dkt # 38 Filed 04/22/13 Page 56 of 100

g.    Counterparts.  This Agreement may be signed in counterparts, each of which shall constitute an original and which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile transmission, email or other electronic means.

h.    Severability.  Any portion or provision of the Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining portions or provisions hereof in such jurisdiction or, to the extent permitted by law, rendering that or any other portion or provision of the Agreement invalid, illegal or unenforceable in any other jurisdiction.

i.    Entire Agreement.  This Agreement constitutes the entire agreement among the parties concerning the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

j.    No Third Party Beneficiaries.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto, their successors and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever.

k.    Amendments; Waivers.  This Agreement and any Exhibit attached hereto may be amended only by agreement in writing of the Company and the Redeemed Member; provided, however, that any amendment of Section 5.k or Section 6 shall be binding on the Continuing Members only if approved in writing by Continuing Members holding a majority of the voting units or equity of the Company; provided, further, that any amendment of Sections 2.b, 2.c, 5.a, 5.b, 5.e, 5.d, 5.f, 5.i, 5.j, or 6 shall be binding on Dustin Shindo only if approved in writing by Dustin Shindo and on Calvin Shindo only if approved in writing by Calvin Shindo. No waiver of any provision nor consent to any exception to the terms of this Agreement shall be effective unless in writing and signed by the party to be bound thereby and then only to the specific purpose, extent and instance so provided.

l.    Installment Sale.  The Company shall use its best efforts to cause the redemption of the Units from the Redeemed Member hereunder to be characterized as installment sale pursuant to the Internal Revenue Code and the rules and regulations promulgated thereunder.

**[Signature pages follow]**

14

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the Effective Date.

HAWAII NUI BREWING LLC

By: ______________________
Name: Keith T. Kinsey
Title: President & Chief Executive Officer

MEHANA TEA COMPANY, INC.

By: ______________________
Name: Dustin Shindo
Title: President

SIGNATURE PAGE TO THE REDEMPTION AGREEMENT AMONG HAWAII NUI BREWING LLC, MEHANA TEA COMPANY, INC. AND JOHN DUSTIN SHINDO, SPECIFICALLY DUSTIN SHINDO, CALVIN SHINDO AND THE MEMBERS AND MANAGERS OF HAWAII NUI BREWING LLC

U.S. Bankruptcy Court - Hawaii #13-00584 Dkt # 38 Filed 04/22/13 Page 58 of 100

The undersigned Continuing Members of Hawaii Nui Brewing LLC hereby agree to be bound by Sections 2.e, 5.k, 6 and 7 only of the above Redemption Agreement.

_____
Keith T. Kinsey

LYTTON I LLC

By: _____
    Nina G. Lytton, Manager

_____
Andrew K. Baker

HAWAII HOLDINGS, LLC

By: _____
    Name: _____
    Title: _____

SIGNATURE PAGE TO THE REDEMPTION AGREEMENT AMONG HAWAII NUI BREWING LLC, MEHANA TEA COMPANY, INC., AND FOR CERTAIN SPECIFIED SECTIONS, DUSTIN SHINDO, CALVIN KATO, AND THE MEMBERS AND MANAGERS OF HAWAII NUI BREWING LLC

U.S. Bankruptcy Court - Hawaii #13-00584 Dkt # 38 Filed 04/22/13 Page 59 of 100

The undersigned Continuing Members of Hawaii Nui Brewing LLC hereby agree to be bound by Sections 2.e, 5.k, 6 and 7 only of the above Redemption Agreement.

_____
Keith T. Kinsey

LYTTON I LLC

By: _____
    Nina G. Lytton, Manager

_____
Andrew K. Baker

HAWAII HOLDINGS, LLC

By: _____
    Name: _____
    Title: _____

SIGNATURE PAGE TO THE REDEMPTION AGREEMENT AMONG HAWAII NUI BREWING LLC, CALVIN SHINDO AND THE MEMBERS AND MANAGERS OF HAWAII NUI BREWING LLC

U.S. BANK, N.A., COMPANY HAWAII AND SUCCESSOR SPECIFIED SECTIONS DUE S60110000

The undersigned Continuing Members of Hawaii Nui Brewing LLC hereby agree to be bound by Sections 2.e, 5.k, 6 and 7 only of the above Redemption Agreement.

_____
Keith T. Kinsey

LYTTON I LLC

By: _____
    Nina G. Lytton, Manager

_____
Andrew K. Baker

HAWAII HOLDINGS, LLC

By: _____
Name: Ann R. Butay
Title: Comptroller

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 61 of 100

The undersigned hereby agree to be bound by Sections 2.b, 2.c., 5.a, 5.b, 5.c, 5.d, 5.e, 5.f, 5.i, 5.j, 6 and 7 only of the above Redemption Agreement.

_____
Dustin Shindo

_____
Calvin Shindo

The undersigned hereby agree to be bound by Sections 2.b, 2.c., 5.a, 5.b, 5.c, 5.d, 5.e, 5.f, 5.i. 5.j, 6 and 7 only of the above Redemption Agreement.

_____
Dustin Shindo

_____
Calvin Shindo

SIGNATURE PAGE TO THE REDEMPTION AGREEMENT AMONG HAWAII NUI BREWING LLC, MEHANA TEA COMPANY, INC., AND FOR CERTAIN SPECIFIED SECTIONS, DUSTIN SHINDO, CALVIN SHINDO AND THE MEMBERS AND MANAGERS OF HAWAII NUI BREWING LLC

U.S. Bankruptcy Court - Hawaii #13-00634 Dkt # 28 Filed 04/22/13 Page 63 of 100

The undersigned Manager of Hawaii Nui Brewing LLC hereby agrees to be bound by Section 6 and Section 7 only of the above Redemption Agreement.

Nina G. Lytton

SIGNATURE PAGE TO THE REDEMPTION AGREEMENT AMONG HAWAII NUI BREWING LLC, MEHANA TEA COMPANY, INC., AND FOR CERTAIN SPECIFIED SECTIONS, DUSTIN SHINDO, CALDER SHINDO, AND THE MEMBERS AND MANAGERS OF HAWAII NUI BREWING LLC

U.S. Bankruptcy Court - Hawaii - #13-00634 - DN # 36 - Filed 04/22/13 - Page 64 of 100

## SCHEDULE 2(d)
Attached to and Made a Part of
the Redemption Agreement, dated as of
June 15, 2011 (the "Agreement")

## PURCHASE PRICE ALLOCATION

| ASSETS | 12/31/10 Tax | 12/31/10 Book | 50% | Allocation Selling price |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash | $ 62,673 | $ 62,673 | $ 31,337 | $ 31,337 |
| Accounts Receivable | 32,397 | 32,397 | 16,199 | 16,199 |
| Inventory | 192,366 | 192,366 | 96,183 | 96,183 |
| Other Current Assets | 25,588 | 25,588 | 12,794 | 12,794 |
| TOTAL CURRENT ASSETS | 313,024 | 313,024 | 156,512 | 156,512 |
| | | | | |
| **FIXED ASSETS** | | | | |
| Equipment & Tangible Assets | 823,884 | 823,884 | 411,942 | 411,942 |
| Less: Accumulated Depreciation | (431,890) | (264,791) | (132,396) | (132,396) |
| | 391,994 | 559,093 | 279,547 | 279,547 |
| | | | | |
| **OTHER ASSETS** | | | | |
| Goodwill | - | - | 80,435 | 80,435 |
| Other Intangible Assets | 105,262 | 105,262 | 52,631 | 52,631 |
| Less: Accumulated Amortization | (21,305) | (21,305) | (10,653) | (10,653) |
| | 83,957 | 83,957 | 122,414 | 122,414 |
| | $ 788,975 | $ 956,074 | $ 558,472 | $ 558,472 |
| **LIABILITIES AND OWNERS EQUITY** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts Payable | $ 155,115 | $ 155,115 | $ 77,558 | $ 77,558 |
| Capital Lease Obligation - Kegs | 86,642 | 86,642 | 43,321 | 43,321 |
| Other Current Liabilities | 25,974 | 25,974 | 12,987 | 12,987 |
| TOTAL CURRENT LIABILITIES | 267,731 | 267,731 | 133,866 | 133,866 |
| | | | | |
| **OTHER LIABILITIES** | | | | |
| Line of Credit - 1st Hawaiian | 149,213 | 149,213 | 74,607 | 74,607 |
| TOTAL LIABILITIES | 416,944 | 416,944 | 208,472 | 208,472 |
| | | | | |
| **OWNERS' EQUITY** | | | | |
| Partners' Capital Accounts | 607,421 | 607,421 | - | - |
| Retained Earnings | (235,390) | (68,291) | - | - |
| Partners' Capital Accounts, net | 372,031 | 539,130 | 350,000 | 350,000 |
| | $ 788,975 | $ 956,074 | $ 558,472 | $ 558,472 |

Schedule 2(d)

**EXHIBIT A**
Attached to and Made a Part of
the Redemption Agreement, dated as of
June 15, 2011 (the "Agreement")

**<u>PROMISSORY NOTE</u>**

[See attached]

This Secured Subordinated Promissory Note (this "Note") shall not be sold, offered for sale, pledged, or hypothecated except as permitted herein. Any attempted transfer of this Note in violation of such terms shall be null and void and of no effect. This Note has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be sold unless (i) a registration statement under the Securities Act is in effect therefor or the Company has received an opinion of counsel to the effect that registration is not required under the Securities Act in connection with such sale or (ii) it is sold in accordance with Rule 144 promulgated under the Securities Act or other available exemption.

## HAWAII NUI BREWING LLC
## SECURED SUBORDINATED PROMISSORY NOTE

June 15, 2011                                                                U.S. $301,000.00

Hawaii Nui Brewing LLC, a Hawaii limited liability company (the "Company"), hereby promises to pay to the order of Mehana Tea Company, Inc., a Hawaii corporation (the "Holder"), the principal amount of Three Hundred One Thousand U.S. Dollars ($301,000.00) together with interest thereon calculated from the date hereof in accordance with the provisions of this Note. This Note is issued pursuant to the Redemption Agreement dated as of June 15, 2011 (the "Redemption Agreement") by and among the Company and Holder. Interest hereunder shall be compounded annually and computed for the actual number of days elapsed on the basis of a year consisting of 360 days, and shall accrue beginning on and after the date of this Note and paid in full on the Maturity Date, unless sooner payable as herein provided. As an inducement for the Holder to enter into the Redemption Agreement and the Note, and to consummate the transactions contemplated therein and herein, the Company hereby makes the representations and warranties set forth in Exhibit A hereto, subject to the exceptions specified in the Disclosure Schedule attached hereto as Exhibit B (the "Disclosure Schedule"), and agrees to each of the affirmative and negative covenants set forth in Exhibit C hereto, which exhibits are incorporated herein and made a part hereof by this reference.

Capitalized terms used and not otherwise defined in this Note (including without limitation Exhibit D hereto, which is incorporated herein and made a party hereof by this reference) shall have the respective meanings given to them in the Redemption Agreement.

1.    Interest.   Interest shall accrue, commencing from June 15, 2011 (the "Effective Date"), on a daily basis on the unpaid principal amount of this Note outstanding from time to time at the rate of: (a) two percent (2.0%) per annum during the period from the Effective Date to and including the first anniversary of the Effective Date, and (b) eighteen percent (18.0%) per annum following the first anniversary of the Effective Date if the Note has not been paid in full on or prior to such first anniversary of the Effective Date. Accrued interest shall be payable (i) annually for the first year and shall be paid on the first anniversary of the Effective Date, and (ii) quarterly after the first anniversary of the Effective Date on March 31, June 30, September 30 and December 31 of each year thereafter, commencing with the first payment on June 30, 2012, until the Note is paid in full. Notwithstanding the foregoing, the interest rate on the unpaid principal amount of this Note shall not be less than the Applicable Federal Rate, as published by

the Internal Revenue Service, that would be applied to this Note to determine the minimum applicable interest rate permitted by law.

2. <u>Form of Payment</u>. Payments of principal and interest on this Note shall be made in legal tender of the United States of America and shall be made to Holder at the offices of Holder at 1260 Honua Street, Hilo, HI 96720, or at such other place as Holder shall have designated in writing to the Company, provided that the final payment of the remaining principal balance of this Note together with any accrued interest or other amounts due hereunder, shall be made in the form of a certified check or at Holder's election by wire transfer to an account designated in writing by Holder. If the date set for any payment of principal or interest on this Note is a Saturday, Sunday or legal holiday, then such payment shall be due on the next succeeding business day.

3. <u>Maturity Date</u>. The principal balance of this Note, and any accrued and unpaid interest hereunder, shall be due and payable, if not earlier paid or payable as provided below in Section 4 or Section 8, upon the third anniversary of the Effective Date (the "<u>Maturity Date</u>").

4. <u>Prepayment(s)</u>. At any time and from time to time, the Company may in its sole discretion, without premium or penalty, prepay all or any portion of the outstanding principal amount of (and interest under) this Note. Any partial prepayment made at the option of the Company shall be applied first to satisfy all accrued but unpaid interest hereunder, and thereafter shall be applied to reduce the amount of principal then outstanding.

This Note must be prepaid by the Company in its entirety, and the entire amount of principal and interest under this Note shall become due and payable, immediately upon and simultaneous with the occurrence or consummation of any Liquidity Event. The term "<u>Liquidity Event</u>" shall mean any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, and shall include (i) any transaction or series of related transactions, pursuant to which the Company sells, conveys, or otherwise disposes of (by lease, license or otherwise) all or substantially all of its property or business or merges with or into or consolidates with any other corporation, limited liability company or other entity, (ii) any transaction or series of related transactions in which a Person (as defined below), other than any member of the Company ("Member") or any Affiliate (as defined below) thereof, or a group of related Persons (other than Members or any Affiliates thereof), acquires from the Company units or other equity or rights representing more than 50% of the equity or voting power of the Company, and (iii) subject to the proviso below, any transaction or series of related transactions in which a Person (as defined below), or a group of related Persons, acquires from Members units or other equity or rights representing more than 50% of the equity or voting power of the Company; provided, however, that the term "Liquidity Event" shall not include any transfer of equity in the Company from a Member of the Company to its Affiliate or to another Member as long as such transfer is either for no consideration or the consideration paid for such equity is less than or equal to the original amount paid by the transferring Member to the Company for such equity.

5. <u>Subordination</u>.

a. All obligations of the Company to Holder shall be subordinated in right of repayment to any and all obligations of the Company for money borrowed ("<u>Senior</u>

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 68 of 100

Indebtedness") to its existing and future commercial bank lenders, including without limitation First Hawaiian Bank and any refinancing of the Company's existing credit facility therewith (including any Small Business Administration loans) (the "First Lien Lenders"), *provided that* the outstanding aggregate principal balance of such senior debt (not including any interest thereon) to the Company's First Lien Lenders shall not exceed One Hundred Twenty Thousand U.S. Dollars ($120,000.00). In addition, Holder understands and agrees that its lien on the Collateral (as defined below) is subject and subordinate to the lien of Paradise Beverages Inc. (the "Second Lien Lender") in respect of its existing loan, in the principal amount of $321,300, on certain bottling equipment and kegs, as described in the existing loan agreement between the Company and Second Lien Lender and the financing statement filed in connection therewith. Holder agrees, from time to time and upon the Company's request, to execute and deliver one or more subordination or intercreditor agreements, in form and substance reasonably satisfactory to such First Lien Lenders and Second Lien Lender, evidencing the subordination set forth in this Section 5 (each, a "Senior Lender Subordination Agreement"). Notwithstanding the foregoing, the Company shall be obligated to make payments to Holder as provided in this Note unless and until the First Lien Lenders shall have declared a default under the Senior Indebtedness and accelerated amounts payable thereunder in accordance with the terms thereof ("Declaration"), and thereafter for so long as such default continues in effect and is not cured or settled. Holder shall have the right to retain any such payments received prior to receiving written notice from the Company of such Declaration.

b. This Note shall be senior in priority to any debt of the Company owed to its Members or any Affiliates thereof, or any other party other than the First Lien Lenders and the Second Lien Lender as provided above, and the Company shall not make any payments of principal or interest to such Members, Affiliates or parties thereof in respect of any monies borrowed from them, and all unpaid interest amounts owed thereto shall accrue, until this Note has been paid in full and cancelled. The Company agrees, from time to time upon Holder's request, to deliver to Holder one or more subordination or intercreditor agreements executed by such Members, Affiliates or other parties to which the Company is indebted, in form and substance satisfactory to Holder, evidencing the agreement of such Company Members, Affiliates or parties to subordinate the Company's obligations to them to the Company's obligations to Holder. The term "Affiliate" shall mean, with respect to any Person, (i) any other Person directly or indirectly controlling, controlled by, or under common control with such Person, including family members of said Person, or (ii) any other Person owning or controlling fifty percent (50%) or more of the outstanding voting interests of such Person. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. The term "Person" shall mean any (i) a partnership, company, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any other organization that is not a natural person, (ii) any natural person or entity, and, (iii) where the context permits, the heirs, executors, administrators, legal representatives, successors and assigns of any of the foregoing.

6.    Security. The Company, as security for the timely and complete performance and payment when due of its obligations hereunder, including all accrued and unpaid interest on this Note and the outstanding principal balance of this Note (collectively, the "Secured Obligations"),

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 69 of 100

hereby mortgages, pledges and hypothecates to Holder, and grants to Holder, a third priority lien on and security interest (such lien and security interest, the "Security Interest") in, to and under the Collateral (as defined below), junior and subordinate only to the liens and security interests granted by the Company to the First Lien Lenders and Second Lien Lender in accordance with the terms of Section 5 of this Note. For purposes of this Note, "Collateral" means all present and future right, title and interest of the Company in or to any property or assets whatsoever, whether now or hereafter acquired and wherever the same may from time to time be located, and all rights and powers of the Company to transfer any interest in or to any property or assets whatsoever, including, without limitation, any and all present and future cash, cash equivalents, deposits, accounts, accounts receivable, contracts (and rights thereunder), rights to payment, goods, merchandise, inventory, general intangibles, intellectual property, claims, notes, instruments and other tangible or intangible property whatsoever, and all proceeds of any and all of the foregoing. The Company agrees to execute such agreements, financing statements and documents and to take such actions as Holder may reasonably request from time to time to evidence, effectuate or perfect the security interests in the Collateral as set forth in this Section 6. Said agreements, financing statements and other documents, including but not limited to this Section 6, shall be referred to herein as the "Security Documents."

7. Events of Default and Remedies. In case one or more of the following events (each an "Event of Default") shall have occurred and be continuing:

a. the Company defaults in the payment of all or any part of the principal of and interest on this Note when the same shall become due and payable, at maturity, by declaration, demand or otherwise, which default continues for five (5) days or more following the date such payment is due;

b. the Company breaches any other material provision of this Note (including but not limited to the covenants set forth in Exhibit C hereto), or of any Security Document executed by the Company in connection herewith, and the failure by the Company to cure such breach within ten (10) days after written notice thereof from Holder;

c. the Company shall (i) commence a voluntary case under any Bankruptcy Law, or authorize, by appropriate proceedings of its board of directors or other governing body, the commencement of such voluntary case; (ii) file an answer or other pleading admitting or failing to deny the material allegations of a petition filed against the Company commencing an involuntary case under any Bankruptcy Law, or seek consent to or acquiesce in the relief therein provided, or fail to controvert timely the material allegations of any such petition; (iii) be subject to the entry of an order for relief in any involuntary case commenced against it under any Bankruptcy Law and such order remains unstayed and in effect for sixty (60) days, or consent to the entry of an order for relief against it in an involuntary case or proceeding; (iv) seek relief as a debtor under any applicable law, other than any Bankruptcy Law, of any jurisdiction relating to the liquidation or reorganization of debtors or to the modification or alteration of the rights of creditors, or consent to such relief; (v) be subject to the entry of an order (and such order, in an involuntary case, remains unstayed and in effect for sixty (60) days) by a court of competent jurisdiction (A) finding of the Company to be bankrupt or insolvent, (B) ordering or approving the liquidation, reorganization or any modification or alteration of the rights of the creditors of the Company, or (C) assuming custody of, or appointing a receiver, trustee, fiscal agent or other

4

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 70 of 100

custodian for, all or a substantial part of the property of the Company; (vi) make a general assignment for the benefit of, or enter into a general composition with, the creditors of the Company, or appoint or consent to the appointment of a receiver, trustee, fiscal agent or other custodian for all or a substantial part of the property of the Company; (vii) admit in writing its inability to pay its debts as the same become due; or (viii) consent to the appointment of a Custodian (as defined below) for the Company or for all or substantially all of the property of the Company;

        d. a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against the Company in an involuntary case, which order or decree remains unstayed and in effect for sixty (60) days, (ii) appoints a Custodian for the Company or for all or substantially all of the property of the Company, or (iii) orders the liquidation of the Company;

        e. there is an uncured default under any loan agreement, promissory note or other similar document with any First Lien Lender or Second Lien, and such First Lien Lender or Second Lien Lender, as the case may be, accelerates the maturity of the Company's obligations thereunder and demands in writing payment thereof by the Company; or

        f. the Company shall fail to execute any of the Security Documents reasonably requested by Holder pursuant to the provisions of Section 6 hereof, or the Company shall otherwise take any action or omit to take any action that causes any of such Security Documents to cease to be in full force and effect or to be perfected, or to be declared null and void or the validity or enforceability thereof shall be contested by the Company, or the Company shall cease to give the Holder the liens, rights, powers and privileges purported to be created thereby (including, without limitation, a third priority perfected security interest in and lien on any collateral pledged as security for the obligations created hereunder), and, in each case, the Company fails to cure such failure, action, omission or cessation within ten (10) days after written notice thereof from Holder;

        g. any representation or warranty made by the Company herein, including but not limited to <u>Exhibit A</u> hereto, or in any Security Document or in any certificate or other instrument delivered under or pursuant to any provision hereof or thereof shall prove to have been false or incorrect in any material respect when made, and the failure by the Company to cure such breach within ten (10) days after written notice thereof from Holder; provided, however, that the provisions of this Section 7.g shall not apply to, and no Event of Default shall be deemed to have occurred in respect of, any representation or warranty made by the Company herein with respect to which the Company can show that any of the Holder, Dustin Shindo or Calvin Shindo has acquired actual knowledge, on or prior to the Effective Date, that such representation or warranty is false or incorrect by having received a written communication from the Company or any officer thereof that discloses that any statement made in such representation or warranty is false or incorrect;

then upon written notice to the Company by the Holder, or, under the circumstances set forth in subsections c, d or e above, automatically and without notice, but subject in all instances to the provisions of any Senior Lender Subordination Agreement and the obligations of the Holder thereunder, the outstanding principal amount hereof with interest accrued thereon shall thereupon

5

become and be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Company notwithstanding anything to the contrary herein or otherwise. In case an Event of Default shall occur, the Company agrees to pay to the Holder on demand such amounts as shall be sufficient to pay the reasonable costs and expenses of collection, liquidation, enforcement and defense of the Holder's rights in the Collateral, this Note or any of the Security Documents, including, without limitation, reasonable attorneys' fees.

"Bankruptcy Law" means Title 11 of the U.S. Code or any similar federal or state law for the relief of debtors, as in effect from time to time.

"Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

8.   Remedies. No right, power or remedy conferred hereby upon the Holder shall be exclusive, and each such right, power or remedy shall be cumulative and in addition to every other right, power or remedy, whether conferred hereby or now or hereafter available under contract, at law, in equity, by statute or otherwise, except as otherwise expressly provided herein.

9.   Interest. In the event that this Note shall require the payment of interest in excess of the maximum amount permissible under applicable law, then the Company's obligation to pay interest hereunder shall, automatically and retroactively, be deemed reduced to the highest maximum amount permissible under applicable law. In the event the Holder receives as interest an amount which would exceed such maximum applicable rate, the amount of any excess interest shall not be applied to the payment of interest hereunder, but shall, automatically and retroactively, be applied to the reduction of the unpaid principal balance due hereunder. In the event and to the extent such excess amount of interest exceeds the outstanding unpaid principal balance hereunder, any such excess amount shall be immediately returned to the Company by the Holder.

10.   Reinstatement. If at any time all or any part of any payment previously made by the Company shall be recovered or rescinded by or on behalf of the Company or must otherwise be restored or returned, whether upon the insolvency, bankruptcy, or reorganization of the Company, the operation of the Hawaii Revised Statutes, by court order, administrative order, settlement, or otherwise, the obligations of the Company under this Note shall continue to be effective or be reinstated, as the case may be, and shall continue as if such payment had never been made by the Company, and the Company shall remain liable for the full amount and complete performance of all obligations under this Note as though such recovered, rescinded, restored or returned payment had not been made or applied, notwithstanding any termination of this Note or the cancellation of any obligations hereunder.

11.   CONSENT TO JURISDICTION AND VENUE. EACH OF THE COMPANY AND THE HOLDER (BY ITS ACCEPTANCE HEREOF) HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN HONOLULU, HAWAII SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS NOTE

6

OR ANY OF THE OTHER SECURITY DOCUMENTS; <u>PROVIDED</u>, THAT NOTHING IN THIS NOTE SHALL BE DEEMED OR OPERATE TO PRECLUDE THE HOLDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ANY COLLATERAL GRANTED AS SECURITY FOR THE OBLIGATIONS CREATED BY THIS NOTE, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE HOLDER. EACH OF THE COMPANY AND THE HOLDER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH OF THE COMPANY AND THE HOLDER HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR *FORUM NON CONVENIENS* (INCONVENIENT FORUM) AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH OF THE COMPANY AND THE HOLDER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE COMPANY OR THE HOLDER AT THE ADDRESS SET FORTH HEREIN AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE COMPANY'S OR THE HOLDER'S ACTUAL RECEIPT THEREOF OR THREE (3) BUSINESS DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

12. <u>WAIVER OF JURY TRIAL</u>. BECAUSE DISPUTES ARISING IN CONNECTION WITH FINANCIAL TRANSACTIONS OF THE TYPE SET FORTH HEREIN ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH, THIS NOTE OR ANY OF THE OTHER SECURITY DOCUMENTS OR THE TRANSACTIONS THERETO.

13. <u>Severability</u>. If one or more provisions of this Note shall be declared invalid, illegal, or unenforceable, the remaining provisions hereof shall remain in full force and effect and shall be construed in the broadest possible manner to effectuate the purposes hereof. The parties further agree to replace such invalid, illegal, or unenforceable provisions with provisions which will achieve, to the extent possible, the economic, business, and other purposes of the invalid, illegal, or unenforceable provisions.

14. <u>Cancellation</u>. Upon the earlier to occur of (i) the Company's payment in full of all principal and accrued interest, if any, and all other payments at any time owed on this Note (including any costs and expenses payable in respect of any Event of Default pursuant to Section

7

7 above), in accordance with the terms of Section 2 and, as the case may be, Section 3 or Section 4 above, and (ii) the transfer of the Company's outstanding equity interests to the Redeemed Member pursuant to Section 5.k of the Redemption Agreement, the Holder shall immediately upon such occurrence surrender this Note to the Company for cancellation and this Note shall immediately be cancelled and shall not be reissued, subject to the terms of Section 10 above.

15.     Transfer.  This Note shall be binding upon the Company and its successors and assigns and upon any Person which assumes the obligations of the Company hereunder; provided, however, that the Company may not assign any of its obligations under this Note without the prior written consent of the Holder.  The Holder shall not sell, assign, pledge, hypothecate, encumber or otherwise transfer, directly or indirectly, this Note (each, a "Transfer") to any Person without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed and shall not require any payments by the Holder; provided that the Holder may, without the Company's prior consent, Transfer this Note to Dustin Shindo, Calvin Shindo, or any of their respective Affiliates, including but not limited to any trust they establish for the primary benefit of themselves or their respective family members, in each case as long as the Transfer is in accordance with Rule 144 promulgated under the Securities Act or other available exemption, or the Holder provides the Company with an opinion of counsel to the effect that such assignment or transfer does not violate any provision of the Securities Act or any other applicable securities laws or regulations.

16.     Amendment and Waiver.  This Note may not be amended, altered or modified except by a written instrument executed by the Holder and the Company.  No course of dealing between or among any Person having any interest in this Note shall be deemed effective to modify, amend or discharge any part of this Note or any rights or obligations of any Person under or by reason of this Note.  No waiver of any of the provisions of this Note shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.

17.     Governing Law; Forum.  This Note and the rights of the Holder and of the Company hereunder shall be interpreted, governed, construed, applied and enforced in accordance with the internal and substantive laws of the State of Hawaii or the United States of America, as applicable, without giving effect to principles of conflict of laws or choice of law rules to the extent that the application of the law of another jurisdiction would be required thereby, regardless of:  (i) where this instrument is executed or delivered; or (ii) where any payment or other performance required by this instrument is made or required to be made; or (iii) where any breach of any provision of this instrument occurs, or any cause of action otherwise accrues; or (iv) where any action or other proceeding is instituted or pending; or (v) the nationality, citizenship, domicile, principal place of business, or jurisdiction of organization or domestication of the Company or the Holder; or (vi) whether the laws of the forum jurisdiction otherwise would apply the laws of a jurisdiction other than the State of Hawaii or the United States of America, as applicable; or (vii) any combination of the foregoing.

18.     Notices.  Any notice, consent, demand, or communication required or permitted to be given by any provision of this Note shall be given in accordance with the provisions of the Redemption Agreement.

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 74 of 100

19. <u>Interpretation</u>.

        a.     When a reference is made in this Note, including the Exhibits hereto, to a Section or Exhibit, such reference shall be to a Section or Exhibit to this Note unless otherwise indicated. The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."

        b.     Every covenant, term, and provision of this Note including the Exhibits hereto shall be construed and interpreted simply according to its fair meaning and shall not be construed or interpreted for or against any party that drafted or caused its legal counsel to draft such covenant, term, or provision.

        c.     The phrase "paid in full" with respect to this Note, and any similar phrase or term, as used in this Note, including the Exhibits hereto, shall mean that the Company has paid all principal and accrued interest, if any, and all other payments at any time owed on this Note (including any costs and expenses payable in respect of any Event of Default pursuant to Section 7 of this Note).

<p align="center">*  *  *  *  *</p>

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 75 of 100

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the date first written above.

HAWAII NUI BREWING LLC

By: _____
Name:
Its:

Accepted and Agreed:

MEHANA TEA COMPANY, INC.

By: _____
Name:
Its:

**SIGNATURE PAGE TO THE SECURED SUBORDINATED PROMISSORY NOTE
ISSUED BY HAWAII NUI BREWING LLC TO MEHANA TEA COMPANY, INC.**

**DATED JUNE 15, 2011**

# EXHIBIT A

## REPRESENTATION AND WARRANTIES

In addition to the representations and warranties of the Company as set forth in the Redemption Agreement, which are incorporated herein by this reference, the Company represents and warrants to Holder the following (which shall survive the execution and delivery of the Note), in each case except as set forth in the Company Disclosure Schedule delivered by the Company to Holder in connection herewith and attached hereto as <u>Exhibit B</u>. All terms used herein, unless otherwise defined herein, shall have the meanings set forth in the Note, including <u>Exhibit D</u> to thereto.

    1.    <u>Limited Liability Company Existence, Power and Authority</u>. The Company is a limited liability company duly organized and in good standing under the laws of Hawaii and is duly qualified as a foreign limited liability company and in good standing in all states or other jurisdictions where the nature and extent of the business transacted by it or the ownership of assets makes such qualification necessary, except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on the Company's financial condition, results of operation or business, or the rights of Holder in or to any of the Collateral. The execution, delivery, and performance of the Note, the other Loan Documents, and the transactions contemplated under the Note and the other Loan Documents are all within the Company's limited liability company powers, have been duly authorized, and are not in contravention of law or the terms of the Company's articles or certificate of organization, bylaws, or other organizational documentation, or any Contract, indenture, agreement, or undertaking to which the Company is a party or by which the Company or its property are bound (provided that the consent of First Hawaiian Bank to this Agreement and the transactions contemplated hereby is received on or prior to the Effective Date, which shall be evidenced and confirmed by the Company's execution and delivery to the Holder of this Note). The Note and the other Loan Documents constitute legal, valid, and binding obligations of the Company enforceable in accordance with their respective terms. The Company does not have any subsidiaries.

    2.    <u>Financial Statements; No Material Adverse Change</u>. The Company interim financial statements for the three month period ended March 31, 2011 that have been or may be delivered by the Company to Holder have been prepared in accordance with GAAP and fairly present in all material respects the financial condition and the results of operation of the Company as of the date and for the period set forth therein, except that the financial statements may not contain any or all footnotes, and may be subject to normal year-end adjustments, as required by GAAP. No event, change or condition has occurred that has had, or could reasonably be expected to have, a material adverse effect on the business, assets, liabilities, operations, condition (financial or otherwise) or operating results of the Company since December 31, 2010, in each case excepting any that are (a) caused by events, conditions or circumstances that generally affect the economy or the industry in which the Company operates if those events, conditions or circumstances do not affect the Company disproportionately as compared to the Company's competitors in the industries in which the Company operates, (b) caused by consequences directly relating to the execution of the Note, any other Loan Document or the Redemption Agreement, the consummation of the transactions contemplated hereby or

<div align="center">A-1</div>

thereby or the public announcement of the transactions contemplated hereby or thereby, (c) generally applicable to financial, banking or securities markets or general economic conditions as a whole, (d) caused by any change in law, in GAAP or in any interpretation thereof, (e) caused by Holder or any of its Affiliates, or (f) resulting from earthquakes, hurricanes, tsunamis or other natural disasters or from the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or resulting from the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States.

3. <u>Tax Returns</u>. The Company has filed, or caused to be filed, in a timely manner all tax returns, reports, and declarations that are required to be filed by it (without requests for extension except as previously disclosed in writing to Holder). All information in the tax returns, reports, and declarations is complete and accurate in all material respects. The Company has paid or caused to be paid all taxes due and payable or claimed due and payable in any assessment received by it, except taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Company and with respect to which adequate reserves have been set on its books. Adequate provision has been made for the payment of all accrued and unpaid Federal, State, county, local, foreign, and other taxes whether or not yet due and payable and whether or not disputed.

4. <u>Litigation</u>. There is no present investigation by any governmental agency pending, or to the best of the Company's knowledge threatened, against or affecting the Company, its assets, or business, and there is no action, suit, proceeding, or claim by any Person pending, or to the best of the Company's knowledge threatened, against the Company or its assets or goodwill, or against or affecting any transactions contemplated by the Note, that if adversely determined against the Company would result in any material adverse change in the assets, business, or prospects of the Company or that would impair the ability of the Company to perform its obligations under the Note or under any of the other Loan Documents to which it is a party or of Holder to enforce the Note or realize on any Collateral.

5. <u>Compliance with Other Agreements and Applicable Laws</u>. The Company is not in default in any material respect under, or in violation in any material respect of any of the terms of, any agreement, contract, instrument, lease, or other commitment to which it is a party or by which it or any of its assets are bound and the Company is in compliance in all material respects with all applicable provisions of laws, rules, regulations, licenses, permits, approvals, and orders of any foreign, Federal, State, or local governmental authority.

6. <u>Disclosure</u>. No representations or warranties made by the Company in this <u>Exhibit A</u> or the Disclosure Schedule contain any untrue statement of a material fact, or omit to state any material fact necessary to make the statements or facts contained therein not misleading.

7. <u>Collateral</u>. The Collateral is owned by the Company free and clear of any Lien, other than the current security interests granted to the First Lien Lender and Second Lien Lender as set forth in the Note.

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 78 of 100

8.    <u>Survival of Warranties; Cumulative.</u> All representations and warranties contained in this Exhibit or any of the other Loan Documents will survive the execution and delivery of the Note. The representations and warranties set forth in this Exhibit are to be cumulative and in addition to any other representations or warranties that the Company shall now or later give, or cause to be given, to Holder.

A-3

# EXHIBIT B

## COMPANY DISCLOSURE SCHEDULE TO
## SECURED SUBORDINATED PROMISSORY NOTE

The disclosure of a particular item of information in this Company Disclosure Schedule ("Disclosure Schedule") to the Secured Subordinated Promissory Note, dated as of June 15, 2011 and including all exhibits thereto (the "Note"), issued by Hawaii Nui Brewing LLC (the "Company") to Mehana Tea Company, Inc. ("Holder"), shall not be taken as an admission by the Company that such disclosure is required to be made under the terms of the representation and warranty and/or covenant to which it is addressed or to any of the representations and warranties and covenants contained in the Note. All capitalized terms used and not otherwise defined in the Disclosure Schedule are as defined in the Note.

All disclosures and exceptions contained herein are intended to modify all of the Company's representations and warranties contained in the referenced Section or subsection of the Note and any other representations and warranties in the Note to the extent that the applicability and relevance of the disclosure to such representations and warranties is apparent and obvious on the face of such disclosure.

To the extent that any representation or warranty contained in the Note is limited or qualified by the materiality of the matters to which the representation or warranty is given, the inclusion of any matter in any section of the Disclosure Schedule does not constitute a determination by the Company that such matters are material or that they would result in a material adverse effect. Nor in such cases where a representation or warranty is given or other information is provided shall the disclosure of any matter in the Disclosure Schedule imply that any other undisclosed matter having a greater value or other significance is material or would result in a material adverse effect.

The inclusion in the Disclosure Schedule of any matter or document shall not imply any representation, warranty or undertaking not expressly given in the Note nor shall such disclosure be taken as extending the scope of any of the representations, warranties or undertakings. Nothing in the Disclosure Schedule constitutes an admission of any liability or obligation of the Company to any third party, or an admission against the interests of the Company.

Copies of any agreements or documents listed below have been made available to the Redeemed Member.

B-1

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 80 of 100

<u>Exhibit A to the Note</u>

Section 2.   <u>Financial Statements; No Material Adverse Change</u>.

      a.     The bottling issues that were caused by the Myer bottling line may have resulted in a material adverse effect on the Company's operations and financial performance over the course of the last 6 months.  The Company lost several accounts over the course of the past year due to the quality issues caused by the Myer bottling line.  In order to address these issues, the Company installed a new bottling line in May 2011, which the Company believes will remedy the quality control issues and help improve the Company's operations and financial performance.

Section 4.   <u>Litigation</u>.

      a.     Starr Business Center ("Starr") has claimed that the Company, or its dissolved subsidiary Ka Keoki Brewing Company, LLC ("Keoki"), breached the lease agreement for Keoki's former brewing facility on Kauai.  The Company believes it has a verbal understanding with Starr to settle the dispute for the amount of $17,500.  The Company is expecting, but has not yet received, the settlement documentation from Starr.

Section 5.   <u>Compliance with Other Agreements and Applicable Laws</u>.

      a.     See item 4.a above.

      b.     The Company currently has overdue accounts payable to Air Liquide America LP, Starr and Paradise Beverages in the approximate amounts set forth below:

| | |
|---|---|
| Air Liquide America LP | $2,615 |
| Starr Business Center | $20,000 |
| Paradise Beverages | $47,221 |

      c.     Certain of the current inventory of labels possessed by the Company for its "Mehana" brands are not in compliance with the labeling requirements for interstate sales under federal law.  Accordingly, any interstate shipments of Mehana bottles by the Company may result in technical violations of federal laws if the labeling requirements for interstate sales are not met.

<u>Exhibit C to the Note</u>

Section 6.   <u>Indebtedness</u>.

      a.     See item 5.b above.

U.S. Bankruptcy Court - Hawaii   #13-00584   Dkt # 38   Filed  04/22/13   Page 81 of 100

## EXHIBIT C

## AFFIRMATIVE AND NEGATIVE COVENANTS

The Company agrees to comply with the following affirmative and negative covenants, and so long as any amounts due under the Secured Subordinated Promissory Note to which this Exhibit is attached (the "Note") remain outstanding. All terms used herein, unless otherwise defined herein, shall have the meanings set forth in the Note, including Exhibit D thereto.

1.     Maintenance of Existence. The Company shall at all times preserve, renew and keep in full force and effect its limited liability company existence and material rights and franchises with respect to its existence and use commercially reasonable efforts to maintain in full force and effect all material permits, intellectual property, approvals, authorizations, leases, and contracts necessary to carry on the business as presently or proposed to be conducted. The Company shall operate in material compliance with its then-current annual and monthly budgets.

2.     Compliance with Laws, Regulations, etc. The Company must, at all times, comply in all material respects with all laws, rules, regulations, licenses, permits, approvals, and orders of any Federal, State, or local governmental authority applicable to it.

3.     Payment of Taxes and Claims. The Company must duly pay and discharge all taxes, assessments, contributions, and governmental charges on or against it or its properties or assets, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Company and with respect to which adequate reserves have been set aside on its books.

4.     Financial Statements and Other Information. In addition to any other requirements with respect to preparation and delivery of financial and other information to Holder that may be set forth in any other Loan Documents, the Company agrees as follows:

(a)     The Company must keep proper books and Records in which entries that are true and complete in all material respects are to be made of all dealings or transactions of or in relation to the Collateral and the business of the Company and its subsidiaries (if any) in accordance with GAAP, and the Company must furnish or cause to be furnished to Holder: (i) as soon as they are available, but in any event within thirty (30) days after the end of each fiscal month, monthly consolidated financial statements (including in each case balance sheets, statements of income and loss, and statements of shareholders' equity), all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of the Company as of the end of and through the fiscal month, subject to normal year-end adjustments and the lack of footnote disclosures; and (ii) within ninety-six (96) days after the end of each fiscal year, consolidated financial statements of the Company (including in each case balance sheets, statements of income and loss, statements of cash flow, and statements of shareholders' equity), and all the Company notes, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of the Company as of the end of and for the fiscal year, together with the opinion, if any, of independent certified public accountants, which accountants shall be Coles & Bodoin, LLP (or another independent

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 82 of 100

accounting firm selected by the Company and reasonably acceptable to Holder), that the financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of the Company as of the end of and for the fiscal year then ended.

(b) The Company must immediately, but in any event within seven (7) days thereafter, notify Holder in writing of the details of: (i) any loss, damage, investigation, action, suit, proceeding, or claim relating to the Collateral or any other property that is security for any of its obligations or that would result in any material adverse change in the Company's business, properties, assets, goodwill, or condition, financial or otherwise; (ii) the occurrence of any Event of Default or event that, with the passage of time or giving of notice or both, would constitute an Event of Default and (iii) the occurrence of any event that could result in the Company's failure to operate materially in accordance with its then current budget or in the event the Company makes any significant revisions of its then current budget.

(c) The Company must furnish or cause to be furnished to Holder copies of the most recent forecasts, projections, and other information possessed by the Company respecting the Collateral and the business of the Company as Holder may, from time to time, reasonably request, promptly but in any event within ten (10) days after each request.

5. <u>Liquidity Events</u>. The Company must not engage in any Liquidity Event unless the Note is paid in full immediately upon and simultaneous with the occurrence or consummation of any Liquidity Event.

6. <u>Indebtedness</u>. The Company must not incur, create, assume, become, or be liable in any manner with respect to, or permit to exist, any obligations for borrowed money, or trade obligations, accruals or purchase money indebtedness, except:

(a) the Senior Indebtedness (as defined in the Note) and the Note;

(b) trade payables determined in accordance with GAAP in the ordinary course of business (i) that do not have an outstanding overdue balance in excess of $20,000 that is more than 55 days past due, or (ii) with respect to which the Company is contesting in good faith their amount or validity by appropriate proceedings diligently pursued and available to the Company, and with respect to which adequate reserves have been set aside on its books;

(c) purchase money indebtedness (including capital leases) to the extent not incurred or secured by Liens (including capital leases) in violation of any other provision of the Note and (i) that do not have an outstanding overdue balance in excess of $20,000 that is more than 45 days past due, or (ii) with respect to which the Company is contesting in good faith their amount or validity by appropriate proceedings diligently pursued and available to the Company, and with respect to which adequate reserves have been set aside on its books; and

(d) loans from Members or their Affiliates that are subordinate to the Note in

<div align="center">C-2</div>

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 83 of 100

accordance with the provisions of Section 5.b of the Note.

7. <u>Liens</u>. The Company must not create, incur, assume or suffer to exist, any Lien.

8. <u>Loans, Investments, Guarantees, etc</u>. The Company must not, directly or indirectly, make any loans or advance money or property to any person, or invest in (by capital contribution, dividend, or otherwise) or purchase or repurchase the equity or indebtedness or all or a substantial part of the assets or property of any person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly) the indebtedness, performance, obligations, or dividends of any Person or agree to do any of the things just described; provided, however, that the foregoing shall not prevent or restrict the Company from redeeming the units or other equity interests of any Member in the Company as long as the sole consideration granted by the Company to such Member in connection with such redemption is in the form of a subordinated note that is subordinate to the Note in accordance with the provisions of Section 5.b of the Note.

9. <u>Issuance of Additional Equity</u>. The Company shall not issue any units, membership interests, options, rights or other equity in the Company to any Person other than the current Members.

10. <u>Management Compensation</u>. The Company shall not increase the annual salary and bonus paid to Keith Kinsey and Andy Baker above the respective aggregate salary and bonus most recently approved by the Company's Board of Directors, without the express prior written consent of the Holder.

11. <u>Dividends and Redemptions</u>. The Company must not, directly or indirectly, declare or pay any dividends or distributions on account of any units or other equity of the Company now or later outstanding, or set aside or otherwise deposit or invest any sums for that purpose, or redeem, retire, defease, purchase, or otherwise acquire any units or other equity of the Company (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration other than common equity or a subordinated note issued to any Member that is subordinate to the Note in accordance with the provisions of Section 5.b of the Note, or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the things just described, in each case other than tax distributions to the Members that are payable in accordance with the provisions of Section 7.2(a) of the Operating Agreement.

C-3

## EXHIBIT D

## CERTAIN DEFINED TERMS

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Boards that are applicable to the circumstances as of the date of determination consistently applied.

"**Lien**" means any security interest, lien, encumbrance or restriction on or with respect to any of the Company's assets or properties, real or personal, whether now owned or hereafter acquired, in each case except:

      (a)     The security interests in the Collateral held by the First Lien Lender and the Second Lien Lender in accordance with the Note;

      (b)     Liens for taxes, assessments and other governmental charges or levies not yet due or as to which the period of grace (not to exceed sixty (60) days), if any, related thereto has not expired or which are being contested in good faith and by appropriate proceedings if adequate reserves are maintained to the extent required by GAAP;

      (c)     the claims of materialmen, mechanics, carriers, workers, repairer, warehousemen, processors or landlords for labor, materials, supplies or rentals and similar statutory or common law liens arising or incurred in the ordinary course of business, (i) which are not overdue for a period of more than sixty (60) days or (ii) which are being contested in good faith and by appropriate proceedings if adequate reserves are maintained to the extent required by GAAP;

      (d)     Liens consisting of deposits or pledges made in the ordinary course of business in connection with, or to secure payment of, obligations under workers' compensation, unemployment insurance or similar legislation;

      (e)     Liens constituting encumbrances in the nature of zoning restrictions, easements, imperfections of title and rights or restrictions of record on the use of real property, and which in the aggregate are not substantial in amount and which do not, in any case, materially detract from the value of such property or impair the use thereof in the ordinary conduct of business;

      (f)     Liens by any lessor or licensor of personal property to the Company on that personal property made in the ordinary course of business;

      (g)     Liens to lenders incurred in deposits made in the ordinary course in connection with maintaining bank accounts;

      (h)     deposits or pledges to secure the payment of workers' compensation, unemployment insurance, social security benefits or obligations arising under similar laws, or to secure the performance of statutory obligations, surety or appeal bonds, and other obligations of a like nature, made in the ordinary course of business;

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 85 of 100

(i)     with respect to intellectual property, non-exclusive licenses of such intellectual property granted in the ordinary course of business; and

(j)     Liens of Holder under the Loan Documents or otherwise created by the actions of Holder.

"**Loan Documents**" means, collectively, the Note, the Security Documents, any Financing statements and all other agreements, documents, certificates and instruments now or at any time executed or delivered by the Company in connection with the Loan Documents (in each case other than the Redemption Agreement), as they now exist or may later be amended, modified, supplemented, extended, renewed, restated, or replaced.

"**Note**" means the Secured Subordinated Promissory Note made by the Company, payable to the order of Holder, and dated as of and delivered on the Effective Date, for the aggregate principal amount of Three Hundred One Thousand Dollars ($301,000.00).

"**Records**" mean all of the Company's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other evidence, statements, correspondence, memoranda, credit files, and other data relating to the Collateral or the Company, together with the tapes, disks, diskettes, and other data and software storage media and devices, file cabinets, or containers in or on which they are stored (including any rights of the Company with respect to them maintained with or by any other person).

D-ii

**EXHIBIT B**
Attached to and Made a Part of
the Redemption Agreement, dated as of
June 15, 2011 (the "Agreement")

## MUTUALLY APPROVED COMPANY HISTORICAL STATEMENTS

1. Previous press release

**Error! Hyperlink reference not valid.**

2. Verbal statements -- for folks the Company meets in the market and in the tasting room.

- The Shindo family sold Mehana to Hawai`i Nui Brewing

- The family is fine

- HNB would be glad to pass along any message to the family

3. New press release

Hawai`i Nui Brewing completes the acquisition of Mehana Brewing

For immediate release: Hilo, Hawaii, June 15, 2011

Contact: Keith Kinsey: 808.895.3818

Today, Hawai`i Nui Brewing announced that it has successfully purchased the remaining equity interest in Hawai`i Nui Brewing that was retained by Mehana Brewing Company as part of the merger.

Hawai`i Nui Brewing and Mehana Brewing Company merged in November 2008, and consolidated all production in Mehana's Hilo facility in 2009.

Hawai`i Nui and Mehana products are the only craft beers to be both brewed and bottled in Hawai`i.

Hawai`i Nui Brewing is firmly committed to local production and packaging. The company recently acquired a new bottling line, doubling its Big Island bottling capacity for the Hawai`i Nui and Mehana brands.

# Exhibit C



# TITLE GUARANTY OF HAWAII, INC.

235 Queen Street • Honolulu, HI 96813
Phone: (808) 533-6261 • Fax: (808) 521-0210

WAGNER CHOI & VERBRUGGE
HONOLULU OFFICE
745 FORT ST. MALL, STE 1900
HONOLULU, HI 96813

Attention:   JENNIFER CZERWINSKI

## FINANCING STATEMENT

Maximum liability limited to
$3,500.00

We have made a search of the Indexes at the Bureau of Conveyances of the State of Hawaii and certify that the following is a list of all U.C.C. financing statement(s) and assignment(s) thereof, against the Debtor(s) hereinafter named, which have been recorded or for which a valid continuation statement has been recorded in said Indexes within the period beginning five (5) years and six (6) months prior to the date of this report and ending on the date of this report.

## DEBTOR(S):   HAWAII NUI BREWING LLC

FINANCING STATEMENT
Document recorded as document No. 2009-010732
Document recorded as document No. 2011-067970
Document recorded as document No. 2011-096288
Document recorded as document No. A-44610417
Document recorded as document No. A-44970797
Document recorded as document No. A-48400734

-Note:-        No search has been made for, and this report does not cover: (1) any financing statements incorporated in a mortgage; and (2) any financing statements or other documents affecting the same which may have been recorded or registered in the filing office of another state or country.

This report is dated March 27, 2013 at 8:00 a.m.
Inquiries concerning this report should be directed to
RTS Customer Service
RTSCustomerService@tghawaii.com
Fax (808)-521-0278
Telephone (808)-533-5874
Refer to Order No. 201317309

R-553

STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
JAN 27, 2009    08:02 AM
Doc No(s) 2009-010732

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER** [optional]
MARIE CADUNGUG 844-3277, BR 48

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

First Hawaiian Bank
Commercial Loan Center #4000
2339 Kamehameha Hwy., Suite 447
Honolulu, HI  96819

/s/ NICKI ANN THOMPSON
REGISTRAR

20    1/1    Z12

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| HAWAII NUI BREWING LLC |  |  |  |  |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 275 EAST KAWILI ST. | HILO | HI | 96720 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
|  |  | LLC | HI | ☒ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  |  |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
|  |  |  |  | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| First Hawaiian Bank |  |  |  |  |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2411 S King St | Honolulu | HI | 96826 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property; all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

U.S. Bankruptcy Court - Hawaii  #13-00584   Dkt # 38   Filed  04/22/13   Page 90 of 100

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Mr. Gordon Usui
Paradise Beverages, Inc.
94-1450 Moaniani St.
Waipahu, HI 96797

R-537    STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
APR 26, 2011        08:02 AM
Doc No(s) 2011-067970

/s/ NICKI ANN THOMPSON
REGISTRAR

20    1/1    Z9

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hawaii Nui Brewing LLC | | | | |

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 275 E. Kawili St | Hilo | HI | 96720 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 61-1517575 | | Beer Manufacturer | Hawaii | | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Paradise Beverages, Inc. | | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 94-1450 Moaniani St. | Waipahu | HI | 96797 | USA |

4. This FINANCING STATEMENT covers the following collateral:

GAI MonoBlocks, Model 3003 A Bier 800 Bottling Line and attachments for 12 oz, 22 oz, 24 oz and litre bottles.

Two Hundred Forty Seven (247) 15.5 gallon Frankie stainless steel kegs

One Thousand One Hundred Eleven (1011) 5 gallon Frankie stainless steel kegs.

Exhibit 1 attached, photo of bottling line   Serial number ALN 3100

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS    Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

| Date of Document: | | # Pages: 15 |
|---|---|---|
| Name of Notary Public: | | Circuit |
| Document Description: Guaranty | | |
| | | |
| Notary Signature | | (Stamp or Seal) |
| NOTARY CERTIFICATION | | |

E X H I B I T  1

<u>B O T T L I N G  L I N E:</u>



Make : GAI MonoBlocks

U.S. Bankruptcy Court - Hawaii  #13-00584  Dkt # 38  Filed  04/22/13  Page 92 of 100

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Mehana Tea Company, Inc.
1260 Honua Street
Hilo, HI 96720
Attn: Dustin Shindo

R-679    STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
JUN 17, 2011    03:00 PM
Doc No(s) 2011-096288

STATE OF HAWAII

/s/ NICKI ANN THOMPSON
REGISTRAR

20    1/1    Z8

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
**Hawaii Nui Brewing LLC**

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 275 East Kawili Street | Hilo | HI | 96720 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | Hawaii | 51856 C5 | NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
**Mehana Tea Company, Inc.**

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1260 Honua Street | Hilo | HI | 96720 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All present and future right, title and interest of the Debtor in or to any property or assets whatsoever, whether now or hereafter acquired and wherever the same may from time to time be located, and all rights and powers of the Debtor to transfer any interest in or to any property or assets whatsoever, including, without limitation, any and all present and future cash, cash equivalents, deposits, accounts, accounts receivable, contracts (and rights thereunder), rights to payment, goods, merchandise, inventory, general intangibles, intellectual property, claims, notes, instruments and other tangible or intangible property whatsoever, and all proceeds of any and all of the foregoing (collectively, the "Collateral"). The Secured Party's lien on and security interest in, to and under the Collateral is junior and subordinate only to the liens and security interests granted by the Debtor to the First Lien Lenders and Second Lien Lender in accordance with the terms of Section 5 of the Secured Subordinated Promissory Note, dated June 15, 2011, issued by the Debtor to the Secured Party (the "Note"). The terms "First Lien Lenders" and "Second Lien Lender" have the respective meanings given them in Section 5.a of the Note.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

International Association of Commercial Administrators (IACA)

STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED

March 19, 2012 8:02 AM

Doc No(s) A-44810417

/s/ NICKI ANN THOMPSON
REGISTRAR

1    1/1    CGG

B-32031223

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Henry T. Nakamoto  (808) 961-0641

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

NAKAMOTO, OKAMOTO & YAMAMOTO
187 KAPIOLANI STREET
HILO, HAWAII  96720

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hawaii Nui Brewing, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 275 Kawili Street | Hilo | HI | 96720 | U.S. |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | Hawaii | ☑ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hilo Soda Works, Inc. | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1260 Honua Street | Hilo | HI | 96720 | U.S. |

**4. This FINANCING STATEMENT covers the following collateral:**

20 ft. refrigerated container and its refrigeration system.
Make: Morgan. Model:  C4. SN:  MA7958303393004GVSRO9120093.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| OR | 9a. ORGANIZATION'S NAME |  |  |
|---|---|---|---|
|  | Hawaii Nui Brewing, LLC |  |  |
|  | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names**

| OR | 11a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|---|
|  | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | □ NONE |
|---|---|---|---|---|---|

**12. □ ADDITIONAL SECURED PARTY'S  or  □ ASSIGNOR S/P'S  NAME - insert only one name (12a or 12b)**

| OR | 12a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
|  | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**13.** This FINANCING STATEMENT covers □ timber to be cut or □ as-extracted collateral, or is filed as a □ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check only if applicable and check only one box.
Debtor is a □ Trust or □ Trustee acting with respect to property held in trust or □ Decedent's Estate

**18.** Check only if applicable and check only one box.
□ Debtor is a TRANSMITTING UTILITY
□ Filed in connection with a Manufactured-Home Transaction — effective 30 years
□ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 07/29/98)

**STATE OF HAWAII**
**BUREAU OF CONVEYANCES**
**RECORDED**

April 24, 2012 10:45 AM

Doc No(s) A-44970797

/s/ NICKI ANN THOMPSON
REGISTRAR

1   1/1   SKC
B-32050777

/s/ NICKI ANN THOMPSON

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Nina Lytton

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Nina Lytton
24 West Cedar Street
Boston MA 02108

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Hawaii Nui Brewing LLC | | | | | |

| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 275 East Kawili Street | Hilo | HI | 96720 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Brewery | Hawaii | 20-8419703 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Lytton I, LLC | | | | | |

| 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|
| ~~Brown~~ Lytton | | Nina | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 24 West Cedar St | Boston | MA | 02108 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

General assets of the Company

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

International Association of Commercial Administrators (IACA)





STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED

April 2, 2013 3:29 PM

Doc No(s) A-48400734

/s/ NICKI ANN THOMPSON
REGISTRAR

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Lex R. Smith #535-5711

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Lex R. Smith
Kobayashi, Sugita & Goda
999 Bishop Street #2600
Honolulu, Hawaii 96813



1     1/1     SKC

B-32239751

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hawaii Nui Brewing LLC | | | | |
| **1b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 275 EAST KAWILI STREET | Hilo | HI | 96720 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | Hawaii | 51856 C5 □ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| **2b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | □ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Lytton I, LLC | | | | |
| **3b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Nina Lytton, 24 West Cedar Street | Boston | MA | 02108 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Exhibit A

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |

**8. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

International Association of Commercial Administrators (IACA)

Exhibit A

All properties, assets and rights of Borrower wherever located, now owned or hereafter acquired or arising, and all proceeds and products thereof and accessions thereto, including, without limitation, all of Borrower's present and future right, title and interest in and to any and all of the following property now owned or hereafter acquired: (i) All Inventory; (ii) All accounts, including but not limited to accounts receivable, notes receivable, health care insurance receivables, and all letters of credit and letter of credit rights, all supporting obligations and all contract rights; (iii) All general intangibles, including, without limitation, all of Borrower's rights (which Lender may exercise or not as it in its sole discretion may determine) to acquire or obtain goods and/or services with respect to the storage, sale, use or installation of any of Borrower's Inventory or other Collateral; (iv) All liens, guaranties, securities, rights, remedies and privileges pertaining to any of the Collateral, including the right of stoppage in transit; (v) All obligations owing to Borrower of every kind and nature, all insurance claims, refunds, premium rebates and proceeds whether arising out of the Collateral or otherwise, and all choses in action; (vi) All tax refunds of every kind and nature to which Borrower is now or may hereafter become entitled, however arising, including, without limitation, loss carry back refunds; (vii) All goodwill, trade secrets, computer programs, customer lists, copyrights, trade names, trademarks, service marks and patents; (viii) All documents and instruments (whether negotiable or nonnegotiable, and whether or not attached to chattel paper); (ix) All Equipment; (x) All proceeds of Collateral of every kind and nature and in whatever form, including, without limitation, both cash and noncash proceeds resulting or arising from the rendering of services by Borrower or the sale or other disposition by Borrower of Inventory or other Collateral; (xi) All books and records relating to the conduct of Borrower's business including, without limitation, those relating to its accounts on whatever medium the same may be recorded, including without limitation, information and records maintained in electronic or computer media, on tapes or discs or otherwise; (xii) All deposit accounts maintained by Borrower with any bank, trust company, investment firm or fund, or any similar institution or organization, and all Investment Property. As used herein the term "Investment Property" shall mean all securities and instruments held by or for the benefit of Borrower, including without limitation all stocks, bonds, obligations of any governmental entity, notes, shares, mutual or money market fund shares; securities entitlements, securities accounts, commodity contracts and accounts and all sums due or to become due on any of the foregoing, and all securities, instruments or other property purchased or acquired as a result of the investment and reinvestment thereof provided, whether in the name of Borrower or another person and whether certificated or uncertificated; and all tenancy in common interests; (xiii) All commercial tort claims, now existing or hereafter arising; and (xiv) All other goods and personal property of Borrower.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

In re

HAWAII NUI BREWING LLC,

      Debtor and
      Debtor-in-Possession.

BK. NO. 13-00584
(Chapter 11)

## DECLARATION OF
## ANDREW K. BAKER IN SUPPORT OF MOTION

I, ANDREW K. BAKER, hereby declare that:

1.    I am one of the founders of Hawaii Nui Brewing LLC (the "Debtor") and have been employed by the Debtor since 2007 in various capacities, including Senior Sales Manager and President. I am currently Manager and President of the Debtor and I am familiar with the Debtor's operations and history.

1.    I make this declaration upon my own personal knowledge and my review of the foregoing *MOTION FOR ORDER AUTHORIZING A) SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS AND ENCUMBRANCES (B) ASSUMPTION AND ASSIGNMENT OF LEASES AND EXECUTORY CONTRACTS MOTION FOR ORDER APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS* (the "Motion"). Terms used herein and not otherwise defined shall have the meanings given them in the Motion.

2.     Attached to the Motion as <u>Exhibit "A"</u> is a true and correct copy of the Purchase and Sale Agreement between Hawaii Nui Brewing LLC, as Seller, and Hawaii Ohana Brewing LLC, as Purchaser.

3.     Attached to the Motion as <u>Exhibit "B"</u> is a true and correct copy of the Redemption Agreement between the Debtor and Mehana Tea Company.

4.     Attached to the Motion as <u>Exhibit "C"</u> is a true and correct copy of the UCC Financing Report for the Debtor dated as of March 27, 2013.

DATED:  Honolulu, Hawaii, April 22, 2013.

_____
ANDREW K. BAKER